## IN THE UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | No. 10- |
| | : | |
| DeMARCO REI, INC., | : | |
| OPM GROUP, LLC, and | : | |
| ANTHONY J. DeMARCO, III | : | |

## UNITED STATES OF AMERICA'S MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

ZANE DAVID MEMEGER
United States Attorney

*Margaret L Hutchinson*

MARGARET L. HUTCHINSON
Chief, Civil Division

*Signature*

MICHAEL S. BLUME
STACEY L. B. SMITH
Assistant United States Attorneys
615 Chestnut St., Suite 1250
Philadelphia PA 19106

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA     :
    :
        v.     :    No. 10-
    :
DeMARCO REI, INC.,     :
OPM GROUP, LLC, and     :
ANTHONY J. DeMARCO, III     :

## UNITED STATES OF AMERICA'S MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

The United States of America, by its undersigned attorneys, moves for a temporary restraining order and preliminary injunction under the Anti-Fraud Injunction Statute, 18 U.S.C. § 1345, upon a finding of probable cause to believe that the defendants have engaged in extensive banking law violations, that is, a mail fraud scheme affecting financial institutions, 18 U.S.C. § 1341, and that the illegally obtained property is being disposed of. The United States seeks to halt the disposition of property obtained as a result of the extensive banking law violations, seeks to prevent the defendants from committing further banking law violations and, seeks any other action the Court deems necessary to prevent a continuing and substantial injury to the victims of the fraud. The fraud targeted homeowners who are now in danger of losing their houses to foreclosure.

To protect the public from the defendants' fraud and to limit the harm to the fraud victims, the United States requests that the Court enjoin defendants DeMarco REI, Inc. ("DeMarco REI"), OPM Group, LLC ("OPM"), and Anthony J. DeMarco, III ("DeMarco") (together "defendants"), all other persons and entities in active concert or participation with the defendants, and third parties who have an interest in properties affected by the fraud, and enter an order granting the following relief:

1.      Enjoining the defendants from committing any banking law violation as defined by 18 U.S.C. § 3322(d);

2.      Enjoining the defendants from making or conspiring to make any false statements to any financial institutions with respect to any real estate transaction;

3.      Enjoining the defendants from participating in any real estate, mortgage, or real property rental transaction except, in the case of the individual defendant, for such transactions involving the individual's personal and primary residence;

4.      Enjoining the defendants and all those receiving notice of any Order and/or Injunction issued by the Court in this matter from transferring, selling, assigning, dissipating, concealing, encumbering, impairing, or otherwise disposing of, in any manner, the properties listed on Exhibit B without prior approval of the Court;

6.      Ordering the defendants and all those receiving notice of any Order and/or Injunction issued by the Court in this matter to preserve all business, financial, accounting, and other records concerning the operations of DeMarco REI, Inc. and OPM, and

7.      Ordering such other and further relief as the Court shall deem just and proper.

In support of its motion, the United States incorporates herein, as if set forth at length, the factual allegations in its Verified Complaint for Injunctive Relief, and submits the accompanying memorandum of law setting forth the legal support for the motion.

Respectfully submitted,

ZANE DAVID MEMEGER
United States Attorney

MARGARET L. HUTCHINSON
Chief, Civil Division

MICHAEL S. BLUME
STACEY L. B. SMITH
Assistant United States Attorneys
615 Chestnut St., Suite 1250
Philadelphia PA 19106

Dated: 12/14/10

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | No. 10- |
| | : | |
| DeMARCO REI, INC., | : | |
| OPM GROUP, LLC, and | : | |
| ANTHONY J. DeMARCO, III | : | |

## MEMORANDUM OF LAW IN SUPPORT OF THE UNITED STATES
## OF AMERICA'S MOTION FOR A TEMPORARY
## RESTRAINING ORDER AND PRELIMINARY INJUNCTION

The United States of America invokes the Anti-Fraud Injunction Statute, 18 U.S.C.

§ 1345, to halt the disposition of property obtained as a result of extensive banking law

violations, to prevent the defendants from committing further banking law violations and, seeks

any other action the Court deems necessary to prevent a continuing and substantial injury to the

victims of the fraud.  By bringing this action, the United States seeks to protect the public and to

secure the proceeds of the defendants' fraud.  Absent the requested injunctive relief, the fraud

will continue to victimize homeowners.

The fraud itself involves a foreclosure rescue scam.  The scam targets homeowners who

have fallen behind on their mortgages.  It promises to save these homeowners from foreclosure.

Instead, the scam misleads the homeowners into selling their homes to "straw" purchasers.  The

homeowners then become renters.  The defendants arrange for the sale of these houses and

purport to manage the rental payments.  In so doing, the defendants prepare false mortgage loan

paperwork to finance the sales, skim the equity from the houses that results from sales, and take

the monthly rent without making the necessary mortgage payments.  The result is that the

mortgage lenders are stuck with loans that are in default, the "straw" purchasers own houses that

are going into foreclosure, and the original homeowners face eviction from their own homes once the foreclosures are complete.[1]

The United States seeks relief that will extend beyond the defendants to reach the various homeowners, third party "straw" purchasers of the houses, and mortgage lenders who have been ensnared by the defendants' fraud. One purpose of the action is to bring all the individuals and entities that have a stake in the affected properties before the Court to create an orderly process – a mediation system with goals akin to a bankruptcy proceeding – by which the damage caused by the defendants' fraud can be mitigated. That process, sanctioned by the applicable statutes, will mean that non-party, non-defendants should be enjoined from engaging in any transactions that will affect the properties at issue here. That process will ensure that all of the victims of the fraud scheme can protect their interests in one forum.

The Anti-Fraud Injunction Statute, referred to herein as Section 1345, authorizes the United States to commence a civil action in any federal court to enjoin persons from disposing of property obtained as a result of a banking law violation, as defined in 18 U.S.C. § 3322(d), which includes violations of the mail fraud statute affecting financial institutions. See 18 U.S.C. § 1345(a)(2). Section 1345 further provides that a district court "may, at any time before final determination, enter such a restraining order or prohibition, or take such other action, as is warranted to prevent a continuing and substantial injury to the United States or to any person or class of persons for whose protection the action is brought." 18 U.S.C. § 1345(b). The

---

[1] A Grand Jury has returned an Indictment charging Anthony J. DeMarco, III, Michael Richard Roberts, Sean Ryan McBride, and Eric Bascove with various crimes associated with this scheme. See United States v. DeMarco, et. al., No. 10-CR-790. The conduct serving as the basis for the Indictment is the same as the conduct described herein and in the Verified Complaint for Injunctive Relief. The Indictment is attached hereto at Exhibit A.

government meets its burden under Section 1345 by demonstrating probable cause to believe that the defendants have engaged in banking law violations (which includes mail fraud that affects a financial institution), and that persons are disposing of the property obtained as a result of those violations.

## I.  FACTUAL BACKGROUND

The relevant facts are discussed in the Verified Complaint and are re-stated here.

The defendants are real estate companies and its principal that purported to help homeowners in danger of losing their homes to foreclosure.  Defendant DeMarco REI, Inc. ("DeMarco REI") is a Pennsylvania corporation with a principal place of business at 1500 J.F.K. Boulevard, Suite 222, Philadelphia, PA 19102.  Defendant OPM Group, LLC ("OPM") is a business entity with a principal place of business at 640 Freedom Road, Suite 201, King of Prussia, PA 19406.  Defendant Anthony J. DeMarco, III, ("DeMarco") is a Pennsylvania resident. He founded DeMarco REI and was its President and Chief Executive Officer.  He also founded OPM and is its principal.

The defendants would scour public records filings to find individuals in financial distress. They would then approach these individuals and pitch a solution.  The pitch – a "sale-leaseback" arrangement – was that the real estate company would buy the homeowner's house.  The homeowner would remain in the house, but pay rent to the real estate company.  When the homeowner got back on his or her feet financially, the homeowner could re-purchase the house.

In fact, the pitch and the sale-leaseback arrangement were a fraud.  If a homeowner agreed to the arrangement, he or she would sell the house to a "straw" party, not the real estate company.  The financial documents supporting that sale and the mortgage obtained to finance the

3

sale were often, if not invariably, doctored.  The real estate company – a defendant here – would

forge signatures, create falsified employment and income verification documents, misrepresent

the flow of cash, and misstate material facts on loan applications.  After the sale, the real estate

company would mishandle rental payments.  Homeowners – now renting from the "straw"

parties – would mail their rent payments to the real estate company.  The real estate company

generally would not, however, use the rental payments to make the monthly payments on the

mortgages on the houses.  Instead, the principal of the real estate companies would siphon off the

funds from the rental payments and use those funds for his own purposes.  As the mortgages fell

into default, the real estate company would then mislead the lending companies as to the reasons

for those defaults in an attempt to satisfy the mortgages on favorable terms and to keep the

fraudulent scheme alive.

The defendants entered into approximately 120 sale-leaseback arrangements.  The bulk of

the 120 properties are in New Jersey and Pennsylvania.  Other properties are located in

California, Connecticut, Florida, Illinois, Indiana, Maryland, and Maine.  Many of the properties

have already been foreclosed upon, but all of the remaining properties are in danger of

foreclosure.  The victims of the fraud are in danger of losing their homes.

**The Fraudulent Scheme**

The fraud at issue began at DeMarco REI.  DeMarco founded DeMarco REI in 2006.

The company sold itself as able to help homeowners in financial distress save their homes.

Employees of DeMarco REI found potential clients by examining public records.  From

these public records, the employees could identify properties that were subject to mortgage

foreclosure actions.  The employees would then contact the owners of these properties, by telephone or through the mails, to offer DeMarco REI's services.

The employees would explain DeMarco REI's services to potential clients as follows. DeMarco REI would purchase the house from the homeowner, thereby paying off the outstanding mortgage.  The homeowner would stay in the house, but pay rent to DeMarco REI.  After a year, the homeowner could purchase the house back from DeMarco REI.  If there was equity in the house at the time of the sale – that is, if the value of the house exceeded the outstanding principal on the mortgage – DeMarco REI would put that money into escrow for the homeowner, either to use as rental payments if necessary or to return to the homeowner at the time of the re-purchase. The DeMarco REI company line held that 20-25% of the homeowners who worked with the company bought their homes back.

The sales pitch outlined above was not true.  The actual transactions that DeMarco REI would conduct were very different from the pitched transactions.

First, DeMarco REI did not purchase the house from the homeowner.  Rather, DeMarco REI recruited people who could act as straw purchasers of the houses.  The company advertised in various newspapers, touting a real estate investment opportunity.  Individuals who responded were told that they would be helping out homeowners in financial distress.  The investors would let DeMarco REI use their good credit to obtain mortgages to buy the houses from these homeowners.  The homeowners would stay in the houses and pay rent to DeMarco REI, which, in turn, would pay for the mortgages.  It was the investors, not DeMarco REI, who now owned the houses of the DeMarco REI clients.  For their trouble, the investors would get a fee – sometimes $5,000, sometimes $7,500 – from DeMarco REI for each transaction.

5

Second, the sales transactions – from the homeowner to the investor – were riddled with fraudulent documents.  As matter of course, DeMarco REI employees falsified the documents associated with the sales transactions.  It was routine for the employees to engage in the following fraud:

a.   DeMarco REI employees filled out mortgage loan applications using false income and employment information and submitted those applications to lenders for loans to finance the sales from the homeowners to the investors.

b.   To support the false income and employment information on the loan applications, DeMarco REI employees created false verification documents (e.g., pay stubs, bank statements, investment account statements) on company computers.  These false documents were also submitted to lenders.

c.   DeMarco REI employees commonly forged the signatures of homeowners and investors alike.  They used a clever system of placing two strips of Scotch tape over a legitimate signature, tracing the signature, removing the top strip, applying that strip to a separate document, and photocopying the document.

d.   DeMarco REI employees hid from lenders the fact that the investors were purchasing multiple houses, a risky venture.  An investor typically acted as a straw purchaser of several houses.  The DeMarco REI employees made sure that, when an investor bought more than one house, the several transactions all occurred within a very short time frame.  That way, the DeMarco REI employees could falsely tell each lender that the investor was only purchasing one house – a less risky proposition – without the lenders learning of the other purchases.  The

close together transactions would not appear in public records in time for lenders to learn of them during their due diligence.

        e.     DeMarco REI employees prepared paper work purporting to show that the investors brought cash to the real estate closings. Bringing cash to the real estate closings was a necessary element of any mortgage loan because the lenders wanted to ensure, in part, that the borrowers had the financial ability to repay the loans. The investors, in fact, put no money into the deals at all. To the contrary, they got money out of the deals.

        f.     DeMarco REI employees prepared fake leases to include in the loan application packages. Aware that the house purchases were for investment purposes, the lenders wanted to know whether the houses would generate income, thereby making it more likely that the borrowers would be able to repay the loans. DeMarco REI employees therefore created fake leases, using fake names for the renters (but actual property addresses – of former residences of friends or family, or of residences the employees found on the internet). The employees then submitted those fake leases to the lenders to support the loan applications.

     Lenders relied on the false information DeMarco REI employees provided to them. They therefore issued mortgage loans that they otherwise would not have issued, had they known the truth about the transactions.

     Third, DeMarco REI misused rental payments. As homeowners made the rental payments – by mail or in person – DeMarco REI deposited them in a company bank account. That money was meant to pay the mortgages on the loans that financed the sale of the houses from the homeowners to the investors. Rather than making the monthly mortgage payments, however, DeMarco REI used the money from the rental payments for other purposes. For

example, the money paid for DeMarco's lavish lifestyle, which included a high-end apartment and luxury cars.

Fourth, DeMarco REI never created any escrow accounts for the homeowners. To the extent that the sales transaction from the homeowner to the investor yielded equity – that is, to the extent the sale price exceeded any outstanding loan balance – the excess money went into a DeMarco REI company bank account. That money was not held in escrow or segregated in any way. Instead, that money was used to pay for DeMarco's lavish lifestyle.

Fifth, no homeowner re-purchased his or her house from DeMarco REI. Contrary to the company's sales pitch, there was not a 20-25% success rate for the company's clients. In fact, not a single client was able to re-purchase his or her house.

One family – M.S. and L.S. – did acquire the wherewithal to re-purchase their house, but DeMarco victimized them even further. The family obtained a large cash settlement in connection with litigation. The family wanted to use some of the settlement proceeds to re-purchase their house from DeMarco REI. They contacted DeMarco himself, who advised them to wire the money to him at a special bank account. The family believed that, by doing so, they would pay off whatever debt they may have owed and that they would have their house returned to them. They wired the money, as DeMarco instructed. DeMarco withdrew the money, went to a luxury sports car dealer, and purchased a Ferrari for himself. He did not pay off any debt the family owed; he did not return their house to them. DeMarco has since sold the car and dissipated the assets.

DeMarco himself conceived of the sale-leaseback arrangements. DeMarco also directed DeMarco REI employees to engage in the fraudulent conduct described herein.

8

### The Affected Properties

DeMarco REI engineered approximately 120 sale-leaseback transactions.  Upon information and belief, Exhibit B contains a comprehensive list of those transactions.  Exhibit B is incorporated herein as if fully set forth.  All of the lenders are financial institutions as defined by 18 U.S.C. § 20.[2]  All of the loans identified on Exhibit B are in danger of foreclosure.  In several instances, lenders have already instituted foreclosure proceedings on the loans.

### The Fraud and its Effects are Ongoing

### Involvement of OPM Group, LLC

Because of a dispute between DeMarco and his wife, B.T., in July 2009, DeMarco renounced any association he had with DeMarco REI.  Upon information and belief, DeMarco REI's operations have ceased.

DeMarco then formed a new company, OPM Group, LLC (hereafter "OPM").  He recruited several former DeMarco REI employees to work with him at OPM.

Throughout 2009 and up until at least January 4, 2010, OPM employees, including DeMarco himself, contacted DeMarco REI clients by telephone and e-mail.  OPM employees told these clients to mail their rental payments to OPM, rather than to DeMarco REI.

---

[2] 18 U.S.C. § 20 was amended in May 2009 to expand the definition of "financial institution."  That amendment brought within the definition all of the entities that provided loans in this case, given that the entities involved are either "mortgage lending businesses," 18 U.S.C. §§ 20(10), 27, or are "an insured depository institution," 18 U.S.C. § 20(1).  Prior to the May 2009 amendments, not all of the lenders affected by the scheme fell within 18 U.S.C. § 20.  However, many did, in that they are "insured depository institution[s]."  The scheme as a whole, then, affected "financial institutions," whether the pre- or post-2009 definition of that term applies.

OPM managed a number of the properties involved in the fraud. DeMarco directed that "management," such as it was. OPM collected rental payments from the original homeowners of several of the properties listed on Exhibit B, but did not pay the mortgages on those properties, however. OPM took steps to attempt to evict original homeowners from several of the properties listed on Exhibit B. OPM also took steps to attempt to sell several of the properties listed on Exhibit B.

### The Effect of the Fraud Is Ongoing, and the Properties Are Being Disposed Of

Because most, if not all, of the mortgages on the properties listed on Exhibit B are in default, several of the mortgage lenders are instituting foreclosure actions. The actions would result in forcing the original homeowners out of their homes. For example, one foreclosure was scheduled for November 24, 2010. Other properties are subject to ongoing litigation in state courts seeking to prevent foreclosures.

Several of the investors or "straws", in attempts to remove themselves from the fraud, are attempting to sell or otherwise dispose of the properties that are in their names. In so doing, several of the investors are moving to evict the original homeowners from their homes.

## II.   ARGUMENT

The United States is entitled to relief under the Anti-Fraud Injunction statute. The Verified Complaint establishes probable cause to believe that the defendants have engaged in an extensive scheme to commit banking law violations, that is, mail fraud that affects financial institutions, and that persons are disposing of the property obtained as a result of those

violations.[3]  The United States' requested injunctive relief is appropriate because, once Section

1345's conditions are met, irreparable harm to the public is presumed.  The government's

showing is sufficient to support the requested relief, which is intended to prevent the dissipation

of property improperly acquired through this criminal scheme, and to protect the public.

A.    **Congress Enacted the Anti-Injunction Statute to Stop Fraud and to Protect the Proceeds of Fraud from Dissipation During the Pendency of Criminal Investigations**

Congress enacted 18 U.S.C. § 1345 as part of the Comprehensive Crime Control Act of

1984.  See Pub. L. No. 98-473, § 1205(a), 98 Stat. 1837, 2152 (1984).  In so doing, Congress

provided the government with a tool that enabled courts to protect the proceeds of a fraudulent

scheme from dissipation while criminal prosecutions are pending.  See S. Rep. 225, 98th Cong.,

2d Sess. 401-02, reprinted in 1984 U.S. Code Cong. & Admin. News 3182, 3539-40; United

States v. Savran, 755 F. Supp. 1165, 1179 (E.D.N.Y. 1991).  Congress recognized that fraud

prosecutions could be lengthy or protracted.

This Court has noted that:

> Section 1345 is a powerful weapon in the government's anti-fraud
> arsenal.  In addition to authorizing injunctive relief to enjoin
> specified ongoing or contemplated crimes, the statue empowers
> courts to enter restraining orders, prohibitions, and "take such other
> action as is warranted to prevent a continuing and substantial injury
> to the United States or to any person or class of person for whose
> protection the action is brought."

United States v. Payment Processing Ctr., 435 F. Supp. 2d 462, 465 (E.D. Pa. 2006) (citing 18

---

[3]The activity underlying the Verified Complaint formed the basis of an Indictment.  That fact should, by itself, establish the necessary probable cause here.  After all, an Indictment may only be returned upon a finding by the Grand Jury of probable cause.  Here, then, there has been a probable cause finding that a fraud has been committed.

U.S.C. § 1345(b)).

In relevant part, Section 1345 reads as follows:

§ 1345. Injunctions against fraud.

(a)(2) If a person is alienating or disposing of property, or intends to alienate or dispose of property, obtained as a result of a banking law violation (as defined in section 3322(d) of this title) or a Federal health care offense or property which is traceable to such violation, the Attorney General may commence a civil action in any Federal court-

> (A) to enjoin such alienation or disposition of property; or

> (B) for a restraining order to -

>> (i) prohibit any person from withdrawing, transferring, removing, dissipating, or disposing of any such property or property of equivalent value; and

>> (ii) appoint a temporary receiver to administer such restraining order.

> (3) A permanent or temporary injunction or restraining order shall be granted without bond.

(b) The court shall proceed as soon as practicable to the hearing and determination of such an action, and may, at any time before final determination, enter such a restraining order or prohibition, or take such other action, as is warranted to prevent a continuing and substantial injury to the United States or to any person or class of persons for whose protection the action is brought.  A proceeding under this section is governed by the Federal Rules of Civil Procedure, except that, if an indictment has been returned against the respondent, discovery is governed by the Federal Rules of Criminal Procedure.

18 U.S.C. § 1345.[4]

---

[4]Section 3322(d)(1)(B) defines "banking law violation" to include a mail fraud scheme (18 U.S.C. § 1341) affecting a "financial institution."  18 U.S.C. § 20 defines "financial institution" to include "an insured depository institution," such as a bank that has federal insurance on its deposits.  As of May 2009, § 20 has expanded the definition of "financial institution" to include a "mortgage lending business."  See also 18 U.S.C. § 27 (defining

The defendants' fraudulent scheme falls squarely within the parameters of Section 1345. The Verified Complaint alleges that the defendants orchestrated and participated in a scheme that constitutes a banking law violation. See 18 U.S.C. §§ 1341, 3322(d). Their fraudulent activity involved a scheme to mislead homeowners to enter into transactions that they did not understand, believing that they would thereby save their houses from foreclosure. Central to that scheme was a mortgage loan transaction that happened only because the defendants prepared and submitted fraudulent documents to lenders. These lenders are financial institutions. This fraudulent scheme began as early as 2006 and has continued to at least early 2010. All of the loans identified are in danger of foreclosure. In several instances, lenders have already instituted foreclosure proceedings on the loans. The actions would result in forcing the original homeowners out of their homes. Based on these allegations, the government is entitled under Section 1345 to enjoin the disposition of the property obtained as a result of the defendants' criminal scheme, and to take other appropriate action to prevent a continuing and substantial injury to the victims of the fraud.

B.   **The United States Is Entitled to Relief Once it Has Established Probable Cause to Believe That the Defendants Have Committed Banking Law Violations, and That Persons Are Disposing of the Property Obtained as a Result of Those Violations.**

Under Section 1345, once the United States establishes probable cause to believe that the defendants have committed banking law violations, and that persons are disposing of the property obtained as a result of those violations, the Court shall issue such preliminary injunctive relief as justice requires to protect the victims of the wrongs alleged in the complaint. See United

---

"mortgage lending business").

States v. Payment Processing Ctr., LLC, 435 F.Supp. 2d 462, 463-64 (E.D. Pa. 2006); see also

United States v. Weingold, 844 F. Supp. 1560, 1573 (D.N.J. 1994); United States v. William

Savran & Assocs., 755 F. Supp. 1165 (E.D.N.Y. 1991); United States v. Belden, 714 F. Supp.

42,45-46 (N.D.N.Y. 1987); United States v. Davis, No. 88-CV-1705, 1988 WL 168562 (S.D.

Fla. Sept. 23, 1988).

   Probable cause is established by showing "facts and circumstances based upon reasonably

trustworthy information, sufficient to justify a person of reasonable caution believing that an act

has occurred or is about to occur." United States v. Cen-Card Agency/C.C.A.C., No. 88-5764,

872 F.2d 414 (3d Cir. March 23,1989) (unpublished) slip op. at 9. The rationale for applying the

"probable cause" standard to a Section 1345 proceeding is based in the legislative history of the

statute and logic. Probable cause is the standard applicable under the statute permitting the

Postal Service to detain mail where there is evidence of mail fraud. See 39 U.S.C. § 3007;

United States v. Beamish, 466 F.2d 804 (3d Cir. 1972) (probable cause standard applies to

injunctions sought under § 3007). In enacting Section 1345, Congress intended to enhance the

government's ability to protect the public. See Belden, 714 F. Supp. at 44-45 (extensive

discussion of legislative history supporting application of probable cause standard in Section

1345 injunctions); Payment Processing Ctr., 435 F. Supp. 2d at 467-68 (discussing the legislative

purpose behind Congress' expansion of authority delegated to the Attorney General under

Section 1345). It would be incongruous to impose a higher substantive standard of proof under

Section 1345, where Congress intended to provide the government a better weapon to protect

victims of fraudulent schemes during the often lengthy time required to investigate and prosecute the underlying charges.  See Belden, 714 F. Supp. at 45.[5]

C.     **The Government Is Not Required to Establish Common Law Irreparable Harm to Obtain Injunctive Relief Under Section 1345.**

Courts have consistently held that irreparable harm is not a necessary element for a Section 1345 injunction.  In United States v. Weingold, 844 F. Supp. 1560 (D.N.J. 1994), the court ruled "[p]roof of irreparable harm is not necessary for the Government to obtain a preliminary injunction."  Similarly, in United States v. Quadro Corp., 916 F. Supp. 613, 617 (E.D. Tex. 1996), aff'd, 127 F.3d 34 (5th Cir. 1997), the court held that the government is "not required to prove irreparable harm under § 1345. . . .  Irreparable harm need not be demonstrated because so long as the statutory conditions are met, irreparable harm to the public is presumed."

---

[5]  Many courts have adopted the probable cause standard for Section 1345 injunctions. Others have not.  United States v. Sriram, 147 F. Supp. 2d 914, 938 (E.D. Ill. 2001); United States v. Brown, 988 F.2d 658, 660 (6th Cir. 1993) (imposing traditional standards of civil litigation); United States v. Barnes, 912 F. Supp. 1187 (N.D. Iowa 1996); United States v. Quadro Corp., 916 F. Supp. 6 13 (E.D. Tex. 1996).

The distinction between the probable cause standard and the traditional injunctive standard "may be more apparent than real."  United States v. Fang, 937 F. Supp. 1186, 1196-97 (D. Md. 1996).  As the court noted in Fang, the traditional standard for injunctive relief is "reasonable probability" of success on the merits.  Id.  Reasonable probability of ultimate success must mean something less than actual proof by a preponderance inasmuch as evidence sufficient to support an injunction may be less than that needed to obtain a verdict at trial.  Id. at 1197. Even the definition of "reasonable probability" is substantially the same as the definition of probable cause.  Id.  Thus, there may not be any substantive difference between the traditional standard for issuance of an injunction and the probable cause standard.

In Cen-Card Agency/C.C.A.C., the Court of Appeals declined to address whether a section 1345 injunction should issue based upon less stringent standards because in that case – as in this case – the government's evidence is sufficient to issue an injunction even under the common law requirements.  See Cen-Card Agency, supra, slip op. at 10, n.4.

The basis for such holdings is that if the requirements of Section 1345 are met, then there is an implied finding that irreparable harm, and other elements typically required for injunctive relief under the Federal Rules of Civil Procedure, have been established. United States v. Sriram, 147 F. Supp. 2d 914, 935-936 (N.D. Ill. 2001) (collecting cases).[6]

In this case, even if the Court were to require a showing of traditional irreparable harm, it is easily established. In Cen-Card, the Court of Appeals affirmed a finding of irreparable harm based upon the fact that the continued operation of the defendants' consumer fraud would "harm the integrity of the postal system," as well as the "large number of people" who could "irretrievably lose their money if immediate action was not taken by the district court." Id., slip op. at 13. Here, if the dissipation of the property is not stopped, the homeowners will continue to be forced into foreclosure, where the homeowners will lose their houses and be unable to get them back. See Payment Processing Ctr., 435 F. Supp. 2d at 466 (holding that, under Section 1345(a)(2), "it defies logic to suggest Congress sought to halt ongoing criminal activity, but simultaneously opted to leave victim funds unprotected during a lengthy criminal investigation or ongoing civil suit.") Thus, the government will lose the opportunity to regain for the fraud victims the assets that have been stolen via the defendants' scheme. The harm the defendants have caused, and will continue to cause absent an injunction, is irreparable.

---

[6] The Court of Appeals has recognized that Congress can statutorily modify substantive elements for equitable injunctive relief, as it has for Postal fraud injunctions under 39 U.S.C. § 3007. See National Resources Defense Council, Inc. v. Texaco Refinery & Marketing, Inc., 906 F.2d 934, 939-940 (3d Cir. 1990); see also Remed Recovery Care Centers v. Township Williston, 36 F. Supp. 2d. 676, 687 (E.D. Pa. 1999) (holding that irreparable injury is presumed where there has been a violation of the Fair Housing Act).

16

**D.    The Government Has Demonstrated Probable Cause To Believe That the Defendants Have Committed Banking Law Violations, and That Persons Are Disposing of the Property Obtained as a Result of Those Violations.**

The government's Verified Complaint establishes probable cause to believe that the defendants have engaged in an extensive scheme to commit banking law violations, and that persons are disposing of the property obtained as a result of those violations. A "banking law violation" includes a violation of the mail fraud statute that affects a financial institution. See 18 U.S.C. § 3322(d).

In Pereira v. United States, 347 U.S. 1, 8 (1954), the Supreme Court stated that "[t]he elements of the offense of mail fraud . . . are (1) a scheme to defraud, and (2) the mailing of a letter, etc., for the purpose of executing the scheme." The Third Circuit has adopted a three-element statement of the offense, clarifying the intent requirement:

> The essential elements of an offense under 18 U.S.C. § 1341 are (1) the existence of a scheme to defraud; (2) the participation by the defendant in the particular scheme charged with the specific intent to defraud; and (3) the use of the United States mails in furtherance of the fraudulent scheme.

United States v. Hannigan, 27 F.3d 890, 892 (3d Cir. 1994). A "scheme to defraud" is any plan, device, or course of action designed to deprive another of money or property by means of fraud, including by false or fraudulent pretenses, representations or promises, or omissions, concerning a material fact, reasonably calculated to deceive persons of average prudence. See, e.g., United States v. Leahy, 445 F.3d 634, 643 (3d Cir. 2006). The government must prove specific intent to defraud. See Hannigan, 27 F.3d at 892. Specific intent may be inferred from "a material misstatement of fact made with reckless disregard for the truth." Hannigan, 27 F.3d at 892 n. 1.

In <u>Pereira v. United States</u>, 347 U.S. 1 (1954), the Court explained that the scheme need not

"contemplate the use of the mails as an essential element:"

> Where one does an act with knowledge that the use of the mails will
> follow in the ordinary course of business, or where such use can
> reasonably be foreseen, even though not actually intended, then he 'causes'
> the mails to be used.

<u>Pereira</u>, 347 U.S. at 8-9.  However, the mailing must be for the purpose of executing or

attempting to execute the scheme to defraud.  <u>United States v. Maze</u>, 414 U.S. 395, 400 (1974).

The Third Circuit has held that "the mailings must be sufficiently closely related to the scheme to

bring the conduct within the ambit of the mail fraud statute, and the 'scheme's completion [must]

depend [ ] in some way on the charged mailings.'"  <u>United States v. Coyle</u>, 63 F.3d 1239,

1244-45 (3d Cir. 1995) (citations omitted).  The mailing may be routine or innocent and need not

contain false information.  <u>See</u> <u>Schmuck v. United States</u>, 489 U.S. 705, 715 (1989).

    The defendants engaged in mail fraud.  They devised a scheme that misled homeowners –

by affirmative misrepresentations and by omissions – into entering into transactions that the

homeowners did not understand.  At the center of the transactions were mortgage loans, which

the defendants obtained by creating false documents.  These transactions put money directly into

the defendants' hands.  The use of the mails was an important part of the scheme.  The victim

homeowners mailed checks to the defendants.

    The mail fraud scheme affected financial institutions.  The defendants obtained a large

number of mortgages from entities that were and are insured by the Federal Deposit Insurance

Corporation ("FDIC").  These entities are therefore "financial institutions" under 18 U.S.C. § 20

because they are "insured depository institution[s]," 12 U.S.C. § 1813(c)(2).[7] The mail fraud

scheme affected financial institutions in that a large part of the scheme was to obtain money from

such institutions based on false documents and, as a result of the scheme, many of the loans

provided by financial institutions are likely to fail.

The property obtained as a result of the mail fraud scheme is being disposed of. Because

most, if not all, of the mortgages on the properties listed on Exhibit B are in default, several of

the mortgage lenders are instituting foreclosure actions. The actions would result in forcing the

original homeowners out of their homes. For example, one foreclosure was scheduled for as

recently as November 24, 2010. Other properties are subject to ongoing state court litigation that

seeks to prevent foreclosures.

### F.   The Injunctive Relief Sought is Appropriate Under Both § 1345(a)(2) and § 1345(b)

Two provisions of § 1345 support broad injunctive relief. First, § 1345(a)(2) allows the

Court to restrain "any person" from "disposing of" any "property obtained as a result of a

banking law violation." This section allows for the restraint of "property generated from past,

i.e., completed, banking law violations." United States v. Payment Processing Ctr., LLC, 435 F.

Supp. 2d 462, 466-67 (E.D. Pa. 2006). As is discussed infra, this includes restraining parties

who are not defendants in this action and who themselves are victims of the fraud from disposing

of the properties. The proposed injunction would prohibit any transaction involving the houses

once owned by the victim homeowners without prior approval of the Court. The effect of this

---

[7] "[I]nsured depository institution[s]" were "financial institution[s]" under 18 U.S.C. § 20 prior to the 2009 amendments to § 20.

proposed prohibition would fall on the straw party investors and, perhaps, on the lenders (and

their servicers) who hold mortgages on the properties.  The proposed prohibition would limit the

ability of investors to evict the victim homeowners.  And, it would curtail the ability of lenders to

foreclose on the properties and sell them at a sheriff's sale.  It would not deny them that right; it

would, instead, require them to get Court approval before doing so.

Second, § 1345(b) allows the Court to "enter such a restraining order or prohibition, or

take such other action, as is warranted to prevent a continuing and substantial injury . . . to any

person or class of persons for whose protection the action is brought."  The United States submits

that this includes relief such as restraining the defendants from committing any further banking

law violations, or making any further false statements to financial institutions; requiring them to

preserve all business, financial, accounting, and other records concerning the operations of the

defendants, and such other and further relief the Court deems appropriate to prevent a continuing

and substantial injury to the victims.

1.    <b><u>The government seeks to avoid conflict between and among classes of<br>victims.</u></b>

As the description of the scheme should make clear, there are at least three classes of

people or institutions that have been harmed by the fraud.  The first is the original homeowner

who was trying to save his home from foreclosure.  That homeowner is now in danger of losing

his home forever.  The second is the mortgage lender that provided the financing to allow the

straw party investor to purchase the house.  That lender is stuck with a defaulted loan.  The third

is the straw party investor.  Perhaps not a victim himself – he got paid, after all – the investor is

20

the named mortgagor on a defaulted loan. He is stuck with a house he did not want to purchase, a mortgage he did not expect to pay, and a credit history he does not want to be destroyed.

As the description of the scheme should also make clear, there are assets that are at the center of the fraud, assets that could help to make any victims whole. Those assets are the houses themselves.

The problem that the proposed injunction seeks to solve is the possibility that certain classes of victims will take advantage of legal processes that favor them over other classes of victims. That is, to the extent that victims act to mitigate the harm they have suffered, some victims are – absent the injunction – in a better position to do so than are others.

The mortgage lenders can, and have, proceeded with state court foreclosure actions. They can use the state courts to obtain title to the properties and then sell those properties, at sheriffs' sales, to offset any losses they may have suffered as a result of the defaulted mortgages. State court foreclosure proceedings – in and of themselves – will not provide the victimized homeowners the kind of forum they may need to help them stay in their homes. Because they sold their houses, these victims would not be parties to the foreclosure proceedings; the parties would be the mortgage lending bank and the "straw" party. Not being parties, the victimized homeowners may have few, if any, levers with which to influence the proceedings and protect their interests. The victimized homeowners likely would not even receive notice of those proceedings. And, once a sheriffs' sale occurs – and the house is sold – there is unlikely to be any means by which the original homeowner can get his house back.

The straw party investors can seek to evict the original homeowners. Several of the straw party investors have moved to do just that, seeking to get the original homeowners out of the

21

houses and new tenants in the houses.  The straw party investors can then try to collect rent from the new tenants to pay off the mortgages.  The original homeowners would have difficulty staving off an eviction action; if they did pay rent, it was paid to DeMarco, not the straw party. The straw party can therefore establish that the original homeowner has not paid rent and is subject to eviction.

Right now too many of the straw party investors and the mortgage lenders are handling these properties without due regard for the fraud that is at the center of this case.  They are going ahead with evictions and foreclosures so that they can protect their own interests.  They are, in other words, seeking to make themselves whole.  Of course, they have the right to protect their interests and it is understandable that they are doing just that.  Still, we must consider the needs of the victim homeowners.  The proposed injunction will give the Court the opportunity to ensure that everyone here – the victim homeowners, the straw parties, and the mortgage lenders – will have a forum whereby they can work out, in a systematic rather than haphazard way, fair solutions to a problem that they did not cause.  Everyone can seek those solutions before someone takes an action – foreclosure or eviction – that is irrevocable.

2.     **The government proposes an orderly process.**

The government envisions a process by which all the individuals and entities that have a stake in the properties at issue are brought before the Court.  The proposed relief requires that, upon the granting of any restraining order or injunction, the government will send letters to the following: (1) the original homeowners, (2) the straw purchasers, (3) the mortgage lenders, (4) the financial institutions that may have purchased the mortgage loans, and (5) any attorneys who

22

may be representing financial institutions that hold the mortgage loans.[8]  A description of those

letters follows:

1.   The letters to the original homeowners will be sent to the properties.  The government proposes that the letters be in substantially the same form and content as the letter attached hereto at Exhibit C.  The letters will advise the original homeowners of this action, will ask them to contact the United States Attorney if they are interested in trying to reach a mediated resolution with others who may have an interest in the property, and will attach a copy of any relief the Court orders.  The government plans to send the letters to the addresses of the property in order to target those original homeowners who are still in the properties.  If the government is aware that the original homeowner is no longer in the property and the government knows of the original homeowner's new address, then the government will send a letter to that new address.

2.   The letters to the straw parties will be sent to their last known addresses.  The government has obtained most of those addresses from the information in the mortgage loan files.  The government proposes that the letters be in substantially the same form and content as the letter attached hereto at Exhibit D.  The letters will advise the straw parties of this action, will notify them that they may be asked to come before the Court to discuss their interest in any property they purchased, and will attach a copy of any relief the Court orders.

3.   The letters to the mortgage lenders will be sent to their appropriate places of business.  The government obtained those addresses by calling each of the lenders.  The government proposes that the letters be in substantially the same form and content as the letter attached hereto at Exhibit E.  The letters will advise the lenders of this action, will notify them that they may be asked to come before the Court to discuss their interest in any property they purchased, and will attach a copy of any relief the Court orders.

4.   The letters to the financial institutions that may have purchased the mortgage loans will be sent to their appropriate places of business.  The

---

[8]Such notice will be in addition to any notice that the government provides, in the regular course, to victims of alleged criminal acts.  After a grand jury returns an indictment, the government provides notice to the victims of the offenses alleged in that indictment.  The notice is a letter that references a web site on which information about the criminal proceedings can be found.  Because of the Indictment referenced in Exhibit A, some of the individuals and entities that will receive the notice described in the text will also receive notice of the criminal action.

government obtained those addresses by calling each of the financial institutions. The government learned of these financial institutions, and their interest in the properties, by examining publicly available data. The government proposes that the letters be in substantially the same form and content as the letter attached hereto at Exhibit E. The letters will advise the institutions of this action, will notify them that they may be asked to come before the Court to discuss their interest in any property they purchased, and will attach a copy of any relief the Court orders.

5. The letters to the attorneys of the financial institutions that may have purchased the mortgage loans will be sent to their appropriate places of business. The government learned of these attorneys, and their work vis-a-vis the properties, by examining publicly available data. The government proposes that the letters be in substantially the same form and content as the letter attached hereto at Exhibit F. The letters will advise the attorneys of this action, will notify them that their clients may be asked to come before the Court to discuss their interest in any property they purchased, and will attach a copy of any relief the Court orders.

From the letters, the government will learn whether there are original homeowners who are interested in seeking a mediated resolution to any claims they may still have on their property. It is possible that all the original homeowners – who total approximately 120 – will want the opportunity to participate in a mediation. The more likely result is that only a portion will contact the government expressing an interest in a mediation. The government is aware that many of the original homeowners have long since left or abandoned their properties, or have been foreclosed upon, and have moved on to other arrangements.

Once the government learns who among the original homeowners wishes to participate in a mediation, it will report to the Court. (The proposed relief envisions such a report.) The government can assist the Court in scheduling those mediations, which will include the original homeowners, the straw purchasers, and any financial institution with an interest in the property. And, the government can assist the Court in staffing those mediations. The government

recognizes that it is asking the Court to devote judicial resources to a series of negotiations. To use those resources most efficiently, the government will suggest that the mediations be run by volunteer attorneys who have training in such mediations. The Philadelphia Court of Common Pleas has a mediation program for homeowners in foreclosure. It has trained a cadre of volunteers to conduct the mediations. In anticipation of filing this action, the government contacted appropriate officials of the Philadelphia Court of Common Pleas who have stated that they are agreeable to allowing these trained mediators to work with the Court in this matter.

The government has no pre-conceived notion as to the result of the mediations. Some homeowners may be able to re-negotiate mortgages and keep their homes; some homeowners may be able to stay in their homes on a temporary basis; some foreclosures may be inevitable. The government only seeks to allow the mediations to go forward, in a systematic way, so that all of those with interests in the properties – most of whom are victims of a fraud scheme – can seek to protect those interests in some forum.

3.     **The relief the government seeks is not unusual.**

The proposed mediation process is not unusual. Such mediation is becoming ever more common in handling mortgage foreclosures. Often called diversion programs, such mediation is occurring in state courts around the country, most prominently in the Philadelphia Court of Common Pleas. Diversion programs require or encourage parties to a foreclosure action – the homeowners and the lenders – to meet with a trained mediator in a court-supervised setting. Housing officials and housing counselors are often on hand to assist the parties, especially with finding federal, state, and local government programs aimed at helping homeowners in distress.

The parties then work towards finding a solution to the foreclosure – perhaps a loan modification, perhaps a forbearance agreement, perhaps a deed-in-lieu of foreclosure.

A mediation here, then, would be nothing unusual for mortgage lenders. They have been going through such mediations, in various jurisdictions, for some time now. Mediations are not new to them and would not be a surprise to them.[9]

In some senses, the mediations that the government proposes here seek to achieve the same goals as does a bankruptcy proceeding. A bankruptcy proceeding ensures that each creditor to a debtor's estate gets fair treatment. A debtor cannot favor one or more creditors over the others and creditors cannot employ self-help to advantage themselves at the expense of the others. A bankruptcy proceeding avoids a creditor free-for-all grab at a limited debtor's estate.

The mediations here, like a bankruptcy proceeding, hope to avoid a free-for-all grab at the limited assets available to the victims of the fraud. The mediations are no more than a process by which those limited assets – the houses at the center of the scheme – can be made available, in a fair, orderly fashion, to those harmed by the scheme.

---

[9]Many of the properties here are in counties that have diversion programs. That fact, in and of itself, will not guarantee that a foreclosure on a given property will be subject to a mediation, let alone one that includes the original homeowner. Remember, the original homeowner is not on the mortgage; he will not be a party to the foreclosure action. To the extent that there is a mediation of the parties to the action, the original homeowner will not be included. What is more, the diversion programs are typically limited to owner occupied housing. Here, the owners of the house – the straw party investors – do not occupy the house. A foreclosure involving such a property may not be eligible for a diversion program. And, even if it were eligible – because, for example, the original homeowner is a renter – there is no real mechanism to ensure that the original homeowner gets notice of the foreclosure to allow him to request a mediation under a diversion program.

### 4.   **Section 1345 allows such a broad injunction.**

It is true that the effect of the proposed injunction on the disposition of the property is broad in that it will restrain parties who are not defendants in this action and who themselves are victims of the fraud. Still, § 1345 allows such an injunction. The statute allows a Court to restrain "any person," which language suggests that an injunction under the statute can reach third parties. See, e.g., 18 U.S.C. § 1345(a)(2); United States v. DBB, Inc., 180 F.3d 1277, 1286 (11th Cir. 1999) (noting, in dicta, that § 1345 "appears to also authorize injunctions that prevent third parties from removing a defendant's assets"). As to the remaining injunctive relief, which would only affect the defendants' and their agents' ability to commit further fraud, the statute allows a Court to "take such other action, as is warranted to prevent a continuing and substantial injury" to the persons that the injunction is designed to protect. 18 U.S.C. § 1345(b).[10]

---

[10]The government is aware of one case, United States v. Mercy Regional Health Sys., Ltd., 2008 WL 695918 (S.D. Ill. 2008), in which a court declined to extend a § 1345 restraining order to reach third parties that held assets traceable to a health care fraud scheme. The court in Mercy Health held that § 1345 injunctions must comply with the traditional standards of injunctive relief embodied in Federal Rule of Civil Procedure 65. Such standards generally do not permit a court to enjoin third parties unless they are in active concert with the defendants. The government respectfully suggests that Mercy Health was incorrect on this point. First, as is detailed in the text, Congress meant for § 1345 to go beyond the traditional Rule 65 injunction standards. For example, § 1345 allows for relief upon a showing of mere "probable cause," rather than "reasonable probability of success." What is more, a § 1345 injunction will issue without the government's needing to show irreparable harm. Given the Congressional intent to provide the government with broad injunctive powers here, it is fair to conclude that when Congress said "any person" in § 1345, it meant "any person." Second, it would "def[y] logic" and be a "hollow remedy" if § 1345 allowed the government to stop a fraud scheme but prohibited it from acting to prevent the dissipation of the victims' funds or of the property obtained by way of the fraud. Payment Processing Ctr., 435 F. Supp. 2d 462, 466, 467.

### 5.   The criminal process may be inadequate to protect all the victims.

The government is unaware of any rule, process, or procedure in a criminal proceeding that can fully protect the victims in this case.  Criminal statutes require that victims of crimes have a say in the criminal proceedings.  See, e.g., 18 U.S.C. § 3771.  Those statutes also seek to provide restitution to these victims, which restitution could include the return of stolen property. See, e.g., 18 U.S.C. § 363A(b).  The statutes that protect criminal victims, however, are not well equipped to handle this case.  The real harm in the fraud here affected ownership rights in property.  Money alone cannot make all of the victims whole.  There must be some resolution to the issue of ownership rights in the properties.  Because the defendants do not own the properties and do not have an interest in them, any restitution order imposed on them would not reach the properties themselves.  And, by the time of a sentencing, the issue of ownership rights in the property may become moot; the straw purchasers or the mortgage lenders may take action that will make it impossible for the original homeowners to protect whatever rights they wish to assert as to the properties.  Any resolution to the issue of ownership rights in the properties must come by way of a process outside the criminal proceedings.  The government, in this action, is proposing that process.[11]

---

[11]The government does not believe that a forfeiture action would serve the purposes of this action.  First, as noted, the defendants do not own the properties at issue.  Any forfeiture would seek to take property from a third party.  Second, the government is not looking to take title to the properties.  Any forfeiture would therefore involve the cumbersome process of the government's forfeiting the process and then setting in motion individual litigations over each of the properties as claimants assert their claims on the property.

III.    **CONCLUSION**

For these reasons, the United States of America respectfully requests the entry of a

temporary restraining order and preliminary injunction in the form of the order proposed with

this motion.

ZANE DAVID MEMEGER
United States Attorney

MARGARET L. HUTCHINSON
Chief, Civil Division

MICHAEL S. BLUME
STACEY L. B. SMITH
Assistant United States Attorneys
615 Chestnut St., Suite 1250
Philadelphia PA 19106

Dated: 12/14/10

29

# Exhibit A

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL NO. 10- |
| v. | : | DATE FILED: December 9, 2010 |
| ANTHONY JAMES DEMARCO, III | : | VIOLATIONS: |
| MICHAEL RICHARD ROBERTS | | 18 U.S.C. § 1349 (conspiracy – 1 count) |
| SEAN RYAN MCBRIDE | : | 18 U.S.C. § 1341 (mail fraud - 1 count) |
| ERIC BASCOVE | | 18 U.S.C. § 1343 (wire fraud - 8 counts) |
| | : | 18 U.S.C. § 1344 (bank fraud - 4 counts) |
| | | 18 U.S.C. § 1957 (money laundering – 1 count) |
| | : | 18 U.S.C. § 2 (aiding and abetting) |
| | : | Notice of forfeiture |

## I N D I C T M E N T

## COUNT ONE

### THE GRAND JURY CHARGES THAT:

### BACKGROUND

1.      From in or about September 2006 through in or about July 2009, defendant ANTHONY JAMES DEMARCO, III, was the president of DeMarco REI, Inc. ("DeMarco REI"), a mortgage rescue foreclosure company.  From approximately January 2008 through July 2009, defendant DEMARCO operated DeMarco REI from an office in Philadelphia, Pennsylvania.

2.      From in or about June 2008 until in or about early 2009, defendant MICHAEL RICHARD ROBERTS was vice president of sales at DeMarco REI.

3.      From in or about June 2008 to in or about June 2009, defendant ERIC BASCOVE was an employee at DeMarco REI.

4.      At all times material to this indictment, defendant SEAN RYAN

MCBRIDE was a title agent at Settlement Engine, Inc., in Pittsburgh, Pennsylvania.  As a

settlement agent and agent for a title insurance company, defendant MCBRIDE received funds

from lenders and deposited them into an escrow account.  He was obligated to disburse funds

from real estate transactions only as detailed on the settlement statement, also known as a Form

HUD-1, after the buyer of the real estate had provided the required funds for closing.  Settlement

Engine closed loans for DeMarco REI from approximately June 2008 through early December

2008.

5.      At all times relevant to this indictment, Flagstar Bank FSB was a financial

institution headquartered in Troy, Michigan, and its deposits were insured by the Federal Deposit

Insurance Corporation ("FDIC").

6.      At all times relevant to this indictment, American Partners Bank, which

changed its name to Waterfield Bank in January 2008, was a financial institution headquartered

in Germantown, Maryland, and its deposits were insured by the FDIC.

7.      At all times relevant to this indictment, Everbank was a financial

institution headquartered in Jacksonville, Florida, and its deposits were insured by the FDIC.

### THE CONSPIRACY

8.      From in or June 2008 through in or about December 2008, in the Eastern

District of Pennsylvania, and elsewhere, defendants

**ANTHONY JAMES DEMARCO, III,**
**MICHAEL RICHARD ROBERTS**
**SEAN RYAN MCBRIDE, and**
**ERIC BASCOVE**

2

conspired and agreed, together with others known and unknown to the grand jury, to knowingly

devise a scheme to defraud, and to obtain money and property by means of materially false and

fraudulent pretenses, representations, and promises, and to obtain monies owned by and under

the care, custody, and control of a financial institution by means of false and fraudulent

pretenses, representations, and promises, in violation of Title 18, United States Code, Sections

1343 and 1344.

## MANNER AND MEANS

It was part of the conspiracy that:

### DeMarco REI

9.      Defendant ANTHONY JAMES DEMARCO, III, directed his employees

to contact homeowners in financial distress and pitch a solution.  The "pitch" varied, but

typically DeMarco REI employees explained that DeMarco REI would buy the homeowner's

house and rescue the financially distressed homeowner from foreclosure.  Under this plan, the

former homeowner could continue to live in his home, paying rent to DeMarco REI for one year.

DeMarco REI employees claimed that, during that term, they would help repair the homeowner's

credit and assist the homeowner in obtaining a mortgage to repurchase his house.  The DeMarco

REI employees further claimed that, if there was equity in their house at the time of the sale to

DeMarco REI, then DeMarco REI would put that money into an escrow account or rent reserve

account for the homeowner.

10.      However, DeMarco REI did not purchase the house from the homeowner.

Instead, defendant ANTHONY JAMES DEMARCO, III, and his employees solicited "investors"

to buy the homes of people facing foreclosure.  Defendant DEMARCO executed contracts with

3

the investors, making clear that the investor would put no money into the transaction.  Rather, DeMarco REI would provide the investor with the down payment to purchase the property and DeMarco REI would make the monthly mortgage payments.

11.     Once an investor was paired with a distressed homeowner, DeMarco REI employees then prepared a mortgage application, also known as a HUD Form 1003, for the investor.  However, in preparing these mortgage applications, defendants ANTHONY JAMES DEMARCO, III, MICHAEL RICHARD ROBERTS, ERIC BASCOVE, and other DeMarco REI employees acting at their direction, made numerous false statements and created numerous false and fraudulent documents to use to secure a larger mortgage loan than a lender would otherwise have approved.

12.     Once an investor had been paired with a homeowner and a mortgage commitment had been secured, DeMarco REI employees arranged for the transaction to go to closing, using various different settlement companies.  At closing, DeMarco REI arranged for the seller's proceeds – i.e., the seller's equity that was supposed to be deposited into an escrow account for the seller – to instead be deposited into DeMarco's REI's checking account.  There never were any escrow accounts.  Defendant DEMARCO then used the sellers' equity to fund the transactions, i.e., to pay the investor's down payment and closing costs, to operate DeMarco REI, and to fund his own lavish lifestyle.

**Settlement Engine, Inc.**

13.     Defendant SEAN RYAN MCBRIDE authorized the disbursement of the proceeds due to the seller at closing from Settlement Engine's escrow account.  Although the settlement statements prepared by Settlement Engine for the DeMarco REI transactions routinely

falsely showed that the sellers' proceeds were disbursed to the sellers, defendant MCBRIDE routinely authorized the disbursement of the sellers' proceeds not to the sellers but to DeMarco REI.

14.     In or about August 2008, defendant SEAN RYAN MCBRIDE began wiring the seller's proceeds to DeMarco REI before DeMarco REI wired the buyer's funds to Settlement Engine, thus enabling DeMarco REI to use the seller's equity to pay the buyer's down payment and closing costs.

## OVERT ACTS

In furtherance of the conspiracy and to accomplish its objects, the defendants committed the following overt acts, among others, in the Eastern District of Pennsylvania and elsewhere:

### The Sale of P.H.'s Home to Investor M.B.

15.     P.H. owned her home in Stowe, Pennsylvania, and had no mortgage.  By 2008, P.H. had financial problems.  Defendant MICHAEL RICHARD ROBERTS called P.H. and they discussed "refinancing" her house.  However, rather than re-financing the house, defendant ROBERTS and others at DeMarco REI arranged to sell the house from P.H. to M.D.B., a DeMarco REI investor.

16.     DeMarco REI employees prepared a false mortgage application to obtain a mortgage loan from Flagstar Bank for investor M.D.B.  In the application, DeMarco REI employees falsely stated that M.D.B. had $70,000 in a bank account at Commerce Bank.  On or about September 18, 2008, defendant ERIC BASCOVE altered M.D.B.'s Commerce Bank account statement, inflating M.D.B.'s ending balance from approximately $3,399.76 to

5

approximately $73,399.76.  Defendant BASCOVE emailed this altered bank statement to defendant MICHAEL RICHARD ROBERTS.  This altered account statement was then sent to Flagstar Bank in support of the mortgage application for M.D.B.'s purchase of P.H.'s house.

17.     Settlement Engine, Inc., was the settlement agent for this transaction.  On or about October 1, 2008, Flagstar Bank wired M.D.B.'s new mortgage loan to Settlement Engine.  Defendant SEAN RYAN MCBRIDE then wired all of the money due to the seller P.H. to DeMarco REI.  In turn, DeMarco REI wired back to Settlement Engine the money due from the buyer, namely, M.D.B.'s down payment and closing costs, and DeMarco REI kept the difference.

### The Sale of R.P.'s Home to Investor D.P.

18.     R.P. owned a condominium in Lincoln Park, New Jersey.  He had no mortgage.  Eventually, R.P. decided to try to sell his condominium.  On or about October 9, 2008, defendant ANTHONY JAMES DEMARCO, III, came to R.P.'s condominium and offered R.P. approximately $304,000 for the condo.  R.P. accepted the offer and signed papers that day.

19.     Defendant ANTHONY JAMES DEMARCO, III, told R.P. that he would wire the money to R.P.'s bank account.  However, no money was ever wired to the account, despite R.P.'s repeated phone calls to defendant DEMARCO and others at DeMarco REI.

20.     Settlement Engine was the closing agent for this transaction, for which Flagstar Bank was the new mortgage lender for the buyer D.P.  Defendant ANTHONY JAMES DEMARCO, III caused a false settlement statement to be prepared.  The HUD shows that D.P. purchased R.P.'s condo for approximately $380,000, paying approximately $89,626.84 in down

6

payment and closing costs. The HUD shows that R.P. received approximately $363,908.21 from the sale of his condo.   DeMarco REI's name appears nowhere on the HUD.

21.      In fact, D.P. was a DeMarco REI investor and he paid nothing to purchase R.P.'s condominium, and R.P. received nothing from the sale of his condominium. Instead, Settlement Engine wired all of the money due to R.P. to DeMarco REI, which then used some of the money to pay D.P.'s down payment and closing costs, wiring that money back to Settlement Engine, and kept the balance.

### The Sale of A.B.'s Home to Investor S.R.

22.      A.B. owned a home on Garden Lane in Bensalem, Pennsylvania.  He was laid-off from his job and fell behind in his mortgage payments.  A DeMarco REI employee called A.B.  The employee offered to help A.B. save his home, regain ownership, and repair his credit. A.B. accepted the offer.

23.      During the settlement for the sale of his home, A.B. asked when he would receive money from the sale, and defendant MICHAEL RICHARD ROBERTS falsely told A.B. that the money would be held in an escrow account and A.B. would get the money when A.B. re-purchased his home.

24.      A DeMarco REI employee recruited S.R. to be a straw purchaser of A.B.'s home.

25.      Settlement Engine closed the transaction on or about December 5, 2008. Defendant SEAN RYAN MCBRIDE took approximately $39,620.62 of the cash due to A.B. and disbursed this money to the personal accounts of defendants ANTHONY JAMES DEMARCO,

III, MICHAEL ROBERTS, and MCBRIDE, and to an account of C.C.  Defendant MCBRIDE

wired the remainder to DeMarco REI's account.

26.    Defendants ANTHONY JAMES DEMARCO, III, MICHAEL ROBERTS,

and SEAN RYAN MCBRIDE caused a false settlement statement to be prepared.  None of the

disbursements described above was reflected on the settlement statement.  Rather, it showed that

A.B. received $104,673.79 from the sale of his house.  In reality, A.B. never received a penny.

### The Sale of R.H.'s Home to Investor S.R.

27.    On or about December 9, 2008, in relation to a closing for the sale of

R.H.'s home in Pennsauken, New Jersey, to investor S.R., defendant MICHAEL RICHARD

ROBERTS sent an e-mail to P.D. attaching a computer-generated image of a non-existent TD

Bank Official Check, purportedly purchased by the buyer and payable to the seller for

approximately $41,136.93.  In reality, there was no such check, and the seller received nothing

from the sale of her home.

All in violation of Title 18, United States Code, Section 1349.

## COUNT TWO

**THE GRAND JURY FURTHER CHARGES THAT:**

1.        Paragraphs 1 through 7 and 9-12 of Count One of this indictment are

incorporated here.

### THE SCHEME

2.        From approximately in or about 2006 to in or about April 2009,

**ANTHONY JAMES DEMARCO, III,**

knowingly devised and intended to devise a scheme to defraud, and to obtain money and property

by means of false and fraudulent pretenses, representations and promises.

3.        In total, from approximately 2006 through April 2009, defendant

ANTHONY JAMES DEMARCO, III, and his criminal associates fraudulently obtained

approximately $31 million of new mortgage loans on approximately 114 properties through this

scheme.  From this new mortgage money, defendant DEMARCO obtained approximately $11

million of proceeds due to the sellers (i.e., their equity).

### MANNER AND MEANS

It was part of the scheme that:

#### The Sale of M.S. and L.S.'s Home to M.B.

4.        In 2007, M.S. and L.S. were having financial difficulties and were facing

foreclosure on their home in Spotswood, New Jersey.  A DeMarco REI employee told M.S. that

DeMarco REI would purchase M.S. and L.S.'s home and M.S. and L.S. would lease the house,

paying rent to DeMarco REI, while DeMarco REI restored their credit.  A DeMarco REI

employee told M.S. that after a year he would be able to purchase the house back from DeMarco

REI.

        5.      DeMarco REI employees prepared a fraudulent contract for the sale of

M.S. and L.S.'s home to DeMarco REI which the employees presented to M.S. and L.S. for

signature.  DeMarco REI employees also prepared a contract for the sale of the M.S. and L.S.'s

home to M.B., a DeMarco REI investor.  On or about November 19, 2007, the home was sold to

M.B.

        6.      Over the course of the next year, M.S. and L.S. acquired the funds to re-

purchase their house. They contacted defendant ANTHONY JAMES DEMARCO, III, who told

them to wire funds to a particular account at Sovereign Bank.

        7.      On or about March 5, 2009, at defendant ANTHONY JAMES

DEMARCO, III's direction, M.S. and L.S. wired $245,000 from M.S.'s bank account in New

Jersey to defendant DEMARCO's personal account at Sovereign Bank, which M.S. believed was

a DeMarco REI account.

        8.      On or about March 6, 2009, defendant ANTHONY JAMES DEMARCO,

III used these funds to purchase a Ferrari and to buy jewelry and used none of the funds for the

purchase of M.S. and L.S.'s house.

        9.      On or about March 5, 2009, in Philadelphia, in the Eastern District of

Pennsylvania, and elsewhere, defendant

**ANTHONY JAMES DEMARCO, III,**

for the purpose of executing the scheme described above, and attempting to do so, caused to be

transmitted by means of wire communication in interstate commerce $245,000 from M.S.'s

10

account in New Jersey to defendant DEMARCO's personal account at Sovereign Bank in

Pennsylvania.

All in violation of Title 18, United States Code, Section 1343.

## COUNT THREE

**THE GRAND JURY FURTHER CHARGES THAT:**

1.        Paragraphs 1 through 7 and 9 through 12 of Count One, and paragraphs 2 through 8 of Count Two, are incorporated here.

2.        On or about March 6, 2009, in Philadelphia, in the Eastern District of Pennsylvania, and elsewhere, defendant

### ANTHONY JAMES DEMARCO, III

knowingly engaged in a monetary transaction affecting interstate commerce in criminally derived property of a value greater than $10,000, and such property was derived from a specified unlawful activity, that is wire fraud, in violation of Title 18, United States Code, Section 1343.

All in violation of Title 18, United States Code, Section 1957.

## COUNT FOUR

**THE GRAND JURY FURTHER CHARGES THAT:**

1.      Paragraphs 1 through 7 and 9 through 17 of Count One of this indictment are incorporated here.

2.      In or about October 2008, in Philadelphia, in the Eastern District of Pennsylvania, and elsewhere, defendants

**MICHAEL RICHARD ROBERTS**
**ERIC BASCOVE, and**
**SEAN RYAN MCBRIDE**

knowingly executed, and attempted to execute, and aided and abetted the execution of, a scheme to defraud Flagstar Bank FSB, and to obtain monies owned by and under the care, custody, and control of that bank by means of false and fraudulent pretenses, representations, and promises.

In violation of Title 18, United States Code, Sections 1344 and 2.

13

## COUNT FIVE

**THE GRAND JURY FURTHER CHARGES THAT:**

   1.  Paragraphs 1 through 7 and 9 through 17 of Count One of this indictment are incorporated here.

## THE SCHEME

   2.  From in or about September 2008 to October 1, 2008, defendant

**MICHAEL RICHARD ROBERTS and**
**SEAN RYAN MCBRIDE**

knowingly devised and intended to devise a scheme to defraud, and to obtain money and property by means of false and fraudulent pretenses, representations and promises.

   3.  On or about October 1, 2008, in Pittsburgh, in the Western District of Pennsylvania, and elsewhere, defendants

**MICHAEL RICHARD ROBERTS and**
**SEAN RYAN MCBRIDE**

for the purpose of executing the scheme described above, and aiding and abetting its execution, caused to be transmitted by means of wire communication in interstate commerce, a wire transfer of $114,932.20 from Flagstar Bank in Troy, Michigan, to the escrow account of Settlement Engine, Inc. at PNC Bank in Pittsburgh, Pennsylvania.

   All in violation of Title 18, United States Code, Sections 1343 and 2.

14

## COUNT SIX

**THE GRAND JURY FURTHER CHARGES THAT:**

      1.     Paragraphs 1 through 7 and 9 through 17 of Count One of this indictment are incorporated here.

### THE SCHEME

      2.     From in or about September 2008 to October 1, 2008, defendant

**MICHAEL RICHARD ROBERTS and
SEAN RYAN MCBRIDE**

knowingly devised and intended to devise a scheme to defraud, and to obtain money and property by means of false and fraudulent pretenses, representations and promises.

      3.     On or about September 30, 2008, in Philadelphia, in the Eastern District of Pennsylvania, and elsewhere, defendants

**MICHAEL RICHARD ROBERTS and
SEAN RYAN MCBRIDE**

for the purpose of executing the scheme described above, and aiding and abetting its execution, caused to be transmitted by means of wire communication in interstate commerce, an e-mail message from C.S. at Settlement Engine in Pittsburgh to P.M. at DeMarco REI in Philadelphia, attaching a copy of the HUD for the sale of P.H.'s home to M.D.B. and asking P.M. whether the HUD was "OK."

      All in violation of Title 18, United States Code, Sections 1343 and 2.

15

## COUNT SEVEN

**THE GRAND JURY FURTHER CHARGES THAT:**

1.     Paragraphs 1 through 7, 9 through 14, and 18 through 21 of Count One of this indictment are incorporated here.

2.     In or about October 2008, in Philadelphia, in the Eastern District of Pennsylvania, and elsewhere, defendants

**ANTHONY JAMES DEMARCO, III**
**MICHAEL RICHARD ROBERTS, and**
**SEAN RYAN MCBRIDE**

knowingly executed, and aided and abetted the execution of, a scheme to defraud Flagstar Bank FSB, and to obtain monies owned by and under the care, custody, and control of that bank by means of false and fraudulent pretenses, representations, and promises.

In violation of Title 18, United States Code, Sections 1344 and 2.

16

## COUNT EIGHT

**THE GRAND JURY FURTHER CHARGES THAT:**

     1.     Paragraphs 1 through 7, 9 through 14, and 18 through 21 of Count One of this indictment are incorporated here.

### THE SCHEME

     2.     In or about October 2008, defendant

**ANTHONY JAMES DEMARCO, III
MICHAEL RICHARD ROBERTS, and
SEAN RYAN MCBRIDE**

knowingly devised and intended to devise a scheme to defraud, and to obtain money and property by means of false and fraudulent pretenses, representations and promises.

     3.     On or about October 9, 2008, in the Western District of Pennsylvania, and elsewhere, defendants

**ANTHONY JAMES DEMARCO, III,
MICHAEL RICHARD ROBERTS, and
SEAN RYAN MCBRIDE**

for the purpose of executing the scheme described above, and aiding and abetting its execution, caused to be transmitted by means of wire communication in interstate commerce, a wire transfer of $300,875.48 from Flagstar Bank in Troy, Michigan, to the escrow account of Settlement Engine, Inc. at PNC Bank in Pittsburgh, Pennsylvania.

     All in violation of Title 18, United States Code, Sections 1343 and 2.

17

## COUNT NINE

**THE GRAND JURY FURTHER CHARGES THAT:**

      1.      Paragraphs 1 through 9, 9 through 14, and 18 through 21 of Count One of this indictment are incorporated here.

## THE SCHEME

      2.      In or about October 2008, defendant

**ANTHONY JAMES DEMARCO, III
MICHAEL RICHARD ROBERTS, and
SEAN RYAN MCBRIDE**

knowingly devised and intended to devise a scheme to defraud, and to obtain money and property by means of false and fraudulent pretenses, representations and promises.

      3.      On or about October 9, 2008, in Philadelphia, in the Eastern District of Pennsylvania, and elsewhere, defendants

**ANTHONY JAMES DEMARCO, III,
MICHAEL RICHARD ROBERTS, and
SEAN RYAN MCBRIDE**

for the purpose of executing the scheme described above, and aiding and abetting its execution, caused to be transmitted by means of wire communication in interstate commerce, an e-mail message from C.S. at Settlement Engine in Pittsburgh, Pennsylvania, to defendant MICHAEL RICHARD ROBERTS at DeMarco REI in Philadelphia, advising him that she is sending the HUD, for the sale of R.P.'s home to D.P., to P.M. at DeMarco REI and will then send P.M. the seller packet to give to "you guys."

      All in violation of Title 18, United States Code, Sections 1343 and 2.

18

## COUNT TEN

**THE GRAND JURY FURTHER CHARGES THAT:**

      1.      Paragraphs 1 through 7, 9 through 14, and 22 through 26 of Count One of this indictment are incorporated here.

      2.      In or about December 2008, in Philadelphia, in the Eastern District of Pennsylvania, and elsewhere, defendants

**ANTHONY JAMES DEMARCO, III,**
**MICHAEL RICHARD ROBERTS, and**
**SEAN RYAN MCBRIDE**

knowingly executed, and aided and abetted the execution of, a scheme to defraud American Partners Bank, also known as Waterfield Bank, and to obtain monies owned by and under the care, custody, and control of that bank by means of false and fraudulent pretenses, representations, and promises.

      In violation of Title 18, United States Code, Section 1344 and 2.

## COUNT ELEVEN

**THE GRAND JURY FURTHER CHARGES THAT:**

      1.      Paragraphs 1 through 7, 9 through 12, and 22 through 26 of Count One of this indictment are incorporated here.

### THE SCHEME

      2.      In or about December 2008, defendants

**ANTHONY JAMES DEMARCO, III,**
**MICHAEL RICHARD ROBERTS, and**
**SEAN RYAN MCBRIDE**

knowingly devised and intended to devise a scheme to defraud, and to obtain money and property by means of false and fraudulent pretenses, representations and promises.

      3.      On or about December 5, 2008, in Pittsburgh, in the Western District of Pennsylvania, and elsewhere, defendants

**ANTHONY JAMES DEMARCO, III,**
**MICHAEL RICHARD ROBERTS, and**
**SEAN RYAN MCBRIDE,**

for the purpose of executing the scheme described above, and aiding and abetting its execution, caused to be transmitted by means of wire communication in interstate commerce, a wire transfer of $206,808.38 from American Partners Bank in Carmel, Indiana, to the escrow account of Settlement Engine, Inc. at PNC Bank in Pittsburgh, Pennsylvania.

      All in violation of Title 18, United States Code, Sections 1343 and 2.

## COUNT TWELVE

**THE GRAND JURY FURTHER CHARGES THAT:**

      1.     Paragraphs 1 through 7, 9 through 14, and 22 through 26 of Count One of this indictment are incorporated here.

### THE SCHEME

      2.     In or about December 2008, defendants

**ANTHONY JAMES DEMARCO, III,**
**MICHAEL RICHARD ROBERTS, and**
**SEAN RYAN MCBRIDE**

knowingly devised and intended to devise a scheme to defraud, and to obtain money and property by means of false and fraudulent pretenses, representations and promises.

      3.     On or about December 5, 2008, in Philadelphia, in the Eastern District of Pennsylvania, and elsewhere, defendants

**ANTHONY JAMES DEMARCO, III,**
**MICHAEL RICHARD ROBERTS, and**
**SEAN RYAN MCBRIDE,**

for the purpose of executing the scheme described above, and aiding and abetting its execution, caused to be transmitted by means of wire communication in interstate commerce, an e-mail message from C.S. at Settlement Engine in Pittsburgh to P.M. at DeMarco REI in Philadelphia , attaching a revised HUD for the sale of A.B.'s home to S.R. and asking "How's this one?"

      All in violation of Title 18, United States Code, Sections 1343 and 2.

## COUNT THIRTEEN

**THE GRAND JURY FURTHER CHARGES THAT:**

1. .   Paragraphs 1 through 7 and 9 through 12 of Count One of this indictment are incorporated here.

2.   B.M. inherited his residence in Elizabeth, Pennsylvania, in about 2000. Several years later, B.M. was in the process of divorcing his wife. Their property settlement provided that she would receive half of the appraised value of the home, approximately $60,000. B.M. needed to sell or mortgage his house to obtain this money.

3.   B.M. met with defendant SEAN RYAN MCBRIDE at Settlement Engine in Pittsburgh. Defendant MCBRIDE told B.M. that defendant MCBRIDE would arrange for an investor to purchase the M.B.'s home on a short-term basis, the $60,000 would be paid to B.M.'s wife, and B.M. would be able to re-purchase his home as soon as defendant MCBRIDE could find him the right mortgage lender. B.M. agreed to defendant MCBRIDE's proposal.

4.   Defendant SEAN RYAN MCBRIDE arranged for a straw buyer, J.S., to take title to B.M.'s home. J.S. put no money into the transaction.

5.   Settlement Engine was the settlement agent for this transaction. On or about October 31, 2008, Everbank in Jacksonville, Florida, wired $102,090.77 to Settlement Engine, the new mortgage money.  Defendant SEAN RYAN MCBRIDE took approximately $21,000 of the cash due to B.M. and instead disbursed this money to, among others, himself and J.S. the buyer, who put no money into this transaction. Defendant MCBRIDE also diverted approximately $34,204.02 of the cash due to B.M. to make  the "down payment" and pay closing costs.  These disbursements are not reflected on the settlement statement.

22

6.      B.M. then became a renter, paying approximately $1,050 per month to Lake Haven Management, LLC, a company of which defendant MCBRIDE was president.

7.      In or about October 2008, in Pittsburgh, in the Western District of Pennsylvania, and elsewhere, defendant

**SEAN RYAN MCBRIDE**

knowingly executed, and attempted to execute, a scheme to defraud Everbank, and to obtain monies owned by and under the care, custody, and control of that bank by means of false and fraudulent pretenses, representations, and promises.

In violation of Title 18, United States Code, Section 1344.

## COUNT FOURTEEN

**THE GRAND JURY FURTHER CHARGES THAT:**

      1.     Paragraphs 1 through 7 and paragraphs 9 through 12 of Count One and paragraphs 2 through 6 of Count Thirteen of this indictment are incorporated here.

### THE SCHEME

      2.     In or about October 2008, defendant

### SEAN RYAN MCBRIDE

knowingly devised and intended to devise a scheme to defraud, and to obtain money and property by means of false and fraudulent pretenses, representations and promises.

      3.     On or about October 31, in Pittsburgh, in the Western District of Pennsylvania, and elsewhere, defendant

### SEAN RYAN MCBRIDE

for the purpose of executing the scheme described above, and attempting to do so, caused to be transmitted by means of wire communication in interstate commerce, a wire transfer of approximately $102,090.77 from Everbank in Jacksonville, Florida, to the escrow account of Settlement Engine, Inc. at PNC Bank in Pittsburgh, Pennsylvania.

      All in violation of Title 18, United States Code, Section 1343.

24

## COUNT FIFTEEN

**THE GRAND JURY FURTHER CHARGES THAT:**

1.      Paragraphs 1 through 7 and 9 through 12 of Count One of this indictment are incorporated here.

2.      In July 2009, defendant ANTHONY JAMES DEMARCO, III, left DeMarco REI.

3.      From in or about July 2009 through in or about December 2009, defendant ANTHONY JAMES DEMARCO, III was the Chief Executive Officer of Optima Property Management Group ("OPM Group"), in King of Prussia, Pennsylvania.

4.      In or about the Summer 2009, G.C., an elderly widow on Primrose Street in Philadelphia, Pennsylvania, was facing foreclosure.

5.      Defendant ANTHONY JAMES DEMARCO, III, arranged for the sale of G.C.'s house to J.M., an investor.

6.      A.A. Inc. was the settlement agent for this transaction, which closed on or about September 15, 2009.  The settlement sheet falsely shows that J.M. paid $49,561.74 to cover the down payment and closing costs.  In fact, J.M. paid nothing; instead, OPM Group paid J.M. an investor fee for purchasing G.C.'s house.

7.      On or about September 17, 2009, A.A. wired $49,561.74, the exact amount of the buyer's down payment and closing costs, from the seller's funds to OPM Group. Thereafter, OPM Group wired back $49,561.74 to A.A., the pay the buyer's funds to close.

8.      After the sale of her home to J.M., G.C. remained in her home, paying rent to OPM Group.

9.     On or about October 14, 2009, G.C. sent a Citizens Bank Official Check payable to OPM Group for $1,000 to OPM Group in King of Prussia by Express Mail, for her rent.  On or about October 19, 2009, this check was deposited into OPM Group's bank account.

10.     Although the first mortgage payment on G.C.'s house was due on November 1, 2009, defendant ANTHONY JAMES DEMARCO, III, caused a check backed by insufficient funds to be sent to the mortgage company.  The check ultimately bounced.

11.     On or about October 14, 2009, in Philadelphia, in the Eastern District of Pennsylvania, and elsewhere, defendant

**ANTHONY JAMES DEMARCO, III,**

for the purpose of executing the scheme described above, and attempting to do so, knowingly caused to be delivered by mail according to the directions thereon, an Express Mail package from G.C. in Philadelphia, Pennsylvania, to OPM Group, LLC, in King of Prussia, Pennsylvania, which contained a Citizens Bank Official Check payable to OPM Group for $1,000 to OPM Group.

In violation of Title 18, United States Code, Section 1341.

## NOTICE OF FORFEITURE

**THE GRAND JURY FURTHER CHARGES THAT:**

1.      As a result of the violations of Title 18, United States Code, Sections

1341, 1343, and 1349, set forth in this indictment, defendants

**ANTHONY JAMES DEMARCO, III,
MICHAEL RICHARD ROBERTS,
SEAN RYAN MCBRIDE, and
ERIC BASCOVE**

shall forfeit to the United States of America any property constituting, or derived from, proceeds

obtained directly or indirectly from the commission of such offenses, including, but not limited

to the sum of $31,202,684.

2.      If any of the property described above, as a result of any act or omission of

the defendant:

        a.      cannot be located upon the exercise of due diligence;

        b.      has been transferred to, sold to, or deposited with a third party;

        c.      has been placed beyond the jurisdiction of this Court;

        d.      has been substantially diminished in value; or

        e.      has been commingled with other property which cannot be divided
            without difficulty;

it is the intention of the United States, pursuant to 21 U.S.C. § 853(p), to seek forfeiture of any

other property of the defendant up to the value of the property subject to forfeiture.

All pursuant to Title 18, United States Code, Section 981(a)(1)(C), 28 U.S.C.

§ 2461, and United States Code, Section 853.

**A TRUE BILL:**

_____

**GRAND JURY FOREPERSON**

**ZANE DAVID MEMEGER**
**United States Attorney**

# Exhibit B

| | Subject Property | Original Homeowner | Investor/ "Straw Buyer" | Original Lender & Account | Lender/Servicer Contact Information |
|---|---|---|---|---|---|
| 1 | 10 7th Ave., Cherry Hill, NJ 08003 | R.M. & N.M. | C.R. | Indymac 1010505590 | OneWest Bank c/o Corporation Service Co. 2711 Centerville Road Wilmington, DE 19808 |
| 2 | 100 Errickson Ave., Moorestown, NJ 08057 | M.S. & A.S. | S.T. | Indymac 1010810701 | OneWest Bank c/o Corporation Service Co. 2711 Centerville Road Wilmington, DE 19808 |
| 3 | 100 Norman Ave., Roebling, NJ 08554 | Estate of D.B. | E.A. & M.A. | AmTrust 1671719 | AmTrust Bank Legal Department Attention: Sue Aukerman 1801 E. 9th Street Cleveland, OH 44114 |
| 4 | 103 Tecemseh Trail, Browns Mills, NJ 08015 | A.D. | L.P. | Countrywide 191626811 | Bank of America Attn: Legal & Subpoena Group 100 N. Tryon Street Charlotte, NC 28255-0001 |
| 5 | 104 36th Ave., Monroeville, NJ 07111 | M.P. & T.P. | S.R. | Freedom Mortgage c/o LSC 4767471 | Freedom Mortgage LoanCare Servicing Center, Inc. Attention: Legal Department 3637 Suntara Way, Suite 303 Virginia Beach, VA 23452 |
| 6 | 108 Washington Ave., Irvington, NJ 07111 | L.B. & S.R. | G.M. | Countrywide 194043442 | Bank of America Attn: Legal & Subpoena Group 100 N. Tryon Street Charlotte, NC 28255-0001 |
| 7 | 11 Christine Place, Washington, NJ 07882 | F.D. & K.D | M.H. | Countrywide 171778042 | Bank of America Attn: Legal & Subpoena Group 100 N. Tryon Street Charlotte, NC 28255-0001 |
| 8 | 11 Hampton Lane, Willingboro, NJ 08046 | C.B. & F.B. | K.H. | Freedom Mortgage c/o LoanCare Servicing Center, Inc. 4772612 | Freedom Mortgage LoanCare Servicing Center, Inc. Attention: Legal Department 3637 Suntara Way, Suite 303 Virginia Beach, VA 23452 |
| 9 | 11 Louis St., Perth Amboy, NJ 08861 | A.V. & N.V. | T.B. | Bank of America | Bank of America Attn: Legal & Subpoena Group 100 N. Tryon Street Charlotte, NC 28255-0001 |
| 10 | 11 Pima Court, Randallstown, MD 21133 | W.T. | J.S. | Wells Fargo 259234664 | Wells Fargo Home Mortgage Attention: Legal Department 1 Home Campus MACX2401-06T Des Moines, IA 50328 |

| | Subject Property | Original Homeowner | Investor/ "Straw Buyer" | Original Lender & Account | Lender/Servicer Contact Information |
|---|---|---|---|---|---|
| 11 | 11 Ridgehurst Rd., West Orange, NJ 07052 | M.L. | S.P. | Atlantic Pacific Mortgage 1015100094 | CitiMortgage Attention: John James 1000 Technology Dr., MS140 O'Fallon, MO 63368 |
| 12 | 1101 Jenkins Parkway, Brigantine, NJ 08203 | A.M.C.F. | B.T. | Countrywide 168139906 & 168139914 | Bank of America Attn: Legal & Subpoena Group 100 N. Tryon Street Charlotte, NC 28255-0001 |
| 13 | 111 20th Street, Union City, NJ 07087 | C.M. | C.R. | Taylor Bean & Whitaker 2277514 | Ocwen Servicing c/o Corporation Service Co. 2711 Centerville Road, Suite 400 Wilmington, DE 19808 |
| 14 | 1128 Birch St., Reading, PA 19604 | J.B. & E.B. | J.S. | BB&T 6991821897 | BB&T Attention: John P. Harmon 301 College Street Greenville, SC 29601 |
| 15 | 12 Fairfax Rd., Edison, NJ 08817 | B.C. & M.L.C. | B.A. | Flagstar Bank 502335601 | Flagstar Bank Attention: Legal Department 5151 Corporate Drive Troy, MI 48098 |
| 16 | 1206 Cornell St., Vineland, NJ 08360 | M.S. & C.S. | F.P. | GMAC 047-757606-0 | GMAC Summons Department GMAC Res. Cap. Attention: Legal Staff 190-FTW-L95 1100 Virginia Drive Fort Washington, PA 19034 |
| 17 | 122 Devon Rd., Somers Point, NJ 08244 | B.S. & W.S. | C.R. | Countrywide 180299658 | Bank of America Attn: Legal & Subpoena Group 100 N. Tryon Street Charlotte, NC 28255-0001 |
| 18 | 122 Eastern Pkwy., Irvington, NJ 07111 | L.M.S. | S.A. | Chase 1860403319 | Chase Court Orders & Levies Dept. 451 Florida Street Baton Rouge, LA 70801 |
| 19 | 1233 W. Tioga St., Philadelphia, PA 19140 | S.W. & T.W. | J.G. | AmTrust Bank 1714396 | AmTrust Bank Legal Department Attention: Sue Aukerman 1801 E. 9th Street Cleveland, OH 44114 |

| | Subject Property | Original Homeowner | Investor/ "Straw Buyer" | Original Lender & Account | Lender/Servicer Contact Information |
|---|---|---|---|---|---|
| 20 | 124 South Broad Street, Penns Grove, NJ 08069 | D.R. | Z.J. | GMAC 477510598 | GMAC Summons Department GMAC Res. Cap. Attention: Legal Staff 190-FTW-L95 1100 Virginia Drive Fort Washington, PA  19034 |
| 21 | 133 Center Avenue, Chesilhurst, NJ 08089 | G.M. | M.L. | Countrywide 169629122 | Bank of America Attn: Legal & Subpoena Group 100 N. Tryon Street Charlotte, NC  28255-0001 |
| 22 | 1432 Filbert St., Glassboro, NJ 08028 | V.G. | J.T. | Countrywide 183707341 | Bank of America Attn: Legal & Subpoena Group 100 N. Tryon Street Charlotte, NC  28255-0001 |
| 23 | 145 Country Club Blvd., Little Egg Harbor, NJ 08087 | T.H. & D.H. | W.D. | Flagstar Bank 502318881 | Flagstar Bank Attention: Legal Department 5151 Corporate Drive Troy, MI  48098 |
| 24 | 1473 Bond St., Hillside, NJ 07025 | K.R. & M.F. | B.R. | Countrywide 175538987 | Bank of America Attn: Legal & Subpoena Group 100 N. Tryon Street Charlotte, NC  28255-0001 |
| 25 | 15 Catawba Ave., Newfield, NJ 08344 | A.M. & E.M. | W.D. | AmTrust Bank 1745384 | AmTrust Bank Legal Department Attention: Sue Aukerman 1801 E. 9th Street Cleveland, OH  44114 |
| 26 | 1507 Mason Run, Pine Hill, NJ 08021 | N.B. | J.O. | Countrywide 194522298 | Bank of America Attn: Legal & Subpoena Group 100 N. Tryon Street Charlotte, NC  28255-0001 |
| 27 | 1540 Elmwood Avenue, Kissimmee, FL 34744 | J.A. & S.A. | D.H. | Countrywide 130634503 | Bank of America Attn: Legal & Subpoena Group 100 N. Tryon Street Charlotte, NC  28255-0001 |
| 28 | 16 Chicory Street, Browns Mills, NJ 08015 | G.M. & T.M. | J.A. | GMAC 047-753745-0 | GMAC Summons Department GMAC Res. Cap. Attention: Legal Staff 190-FTW-L95 1100 Virginia Drive Fort Washington, PA  19034 |

| | Subject Property | Original Homeowner | Investor/ "Straw Buyer" | Original Lender & Account | Lender/Servicer Contact Information |
|---|---|---|---|---|---|
| 29 | 16 Macarthur St., Spotswood, NJ 08884 | M.S. & L.S. | M.B. | Specialized Loan Servicing 1002915275 | Specialized Loan Servicing Attention: Legal Department P.O. Box 636005 Littleton, CO  80163-6005 |
| 30 | 160 Jeff Street, Edison, NJ 08837 | D.D-H. | C.R. | Countrywide 188255908 | Bank of America Attn: Legal & Subpoena Group 100 N. Tryon Street Charlotte, NC 28255-0001 |
| 31 | 161 New York Ave., Jersey City, NJ 07307 | F.V. | EA. & M.A. | GMAC 047-757434-7 | GMAC Summons Department GMAC Res. Cap. Attention: Legal Staff 190-FTW-L95 1100 Virginia Drive Fort Washington, PA  19034 |
| 32 | 165 Watchung Place, Nutley, NJ 07110 | A.D. | J.O. | Flagstar Bank 502216872 | Flagstar Bank Attention: Legal Department 5151 Corporate Drive Troy, MI  48098 |
| 33 | 17 Shawnee Trail, Sparta, NJ 07871 | T.D. | C.R. | Bank of America 6416936075 | Bank of America Attn: Legal & Subpoena Group 100 N. Tryon Street Charlotte, NC 28255-0001 |
| 34 | 1766  45th St., Pennsauken, NJ 08110 | R.H. | S.R. | Citi AOT 00-1120446499 | CitiMortgage Attention: John James 1000 Technology Drive MS140 O'Fallon, MO  63368 |
| 35 | 18 Cypress Point Rd., Westampton, NJ 08060 | A.T. | M.H. | Chase 1760708631 | Chase Court Orders & Levies Dept. 451 Florida Street Baton Rouge, LA  70801 |
| 36 | 18 Hinsdale Lane, Willingboro, NJ 08046 | A.T. | B.K. | Countrywide 159330524 | Bank of America Attn: Legal & Subpoena Group 100 N. Tryon Street Charlotte, NC 28255-0001 |
| 37 | 18 New Street, Westville, NJ 08093 | B.D. | J.T. & K.T. | Countrywide 182685087 | Bank of America Attn: Legal & Subpoena Group 100 N. Tryon Street Charlotte, NC 28255-0001 |

|    | Subject Property | Original Homeowner | Investor/ "Straw Buyer" | Original Lender & Account | Lender/Servicer Contact Information |
|----|------------------|--------------------|-------------------------|---------------------------|------------------------------------|
| 38 | 19 East Main St., High Bridge, NJ 08829 | D.R. & J.R. | S.P. | Freedom Mortgage Corp 0083168153 | Freedom Mortgage LoanCare Servicing Center, Inc. Attention: Legal Department 3637 Suntara Way, Suite 303 Virginia Beach, VA 23452 |
| 39 | 2 Christopher Ct., Lincoln, NJ 07035 | R.P. | D.P. | Flagstar Bank 502315365-2 | Flagstar Bank Attention: Legal Department 5151 Corporate Drive Troy, MI 48098 |
| 40 | 2 South Harley Ave., Gloucester, NJ 08110 | K.H. | K.H. | GMAC 0-640206542 | GMAC Summons Department GMAC Res. Cap. Attention: Legal Staff 190-FTW-L95 1100 Virginia Drive Fort Washington, PA 19034 |
| 41 | 20 Dunham Loop, Berlin, NJ 08009 | J.G. | B.T. | Chase 1760724660 | Chase Court Orders & Levies Dept. 451 Florida Street Baton Rouge, LA 70801 |
| 42 | 205 Cayuga Tr., Browns Mills, NJ 08015 | S.D. | J.B. | Chase 1760726859 | Chase Court Orders & Levies Dept. 451 Florida Street Baton Rouge, LA 70801 |
| 43 | 21 Diamond Drive, Egg Harbor Twp., NJ 08234 | P.R. & G.R. | M.B. | Countrywide 179434403 | Bank of America Attn: Legal & Subpoena Group 100 N. Tryon Street Charlotte, NC 28255-0001 |
| 44 | 211 Flack Street, Toms River, NJ 08753 | R.B. | L.B. | Countrywide 183837133 | Bank of America Attn: Legal & Subpoena Group 100 N. Tryon Street Charlotte, NC 28255-0001 |
| 45 | 2165 Arthur Pass, New Lenox, IL 60451 | M.S. & M.S. | B.T. | Countrywide 141276218 (1st Mortgage) & 141276210 (2nd Mortgage) | Bank of America Attn: Legal & Subpoena Group 100 N. Tryon Street Charlotte, NC 28255-0001 |
| 46 | 22 N. Pearl Street, Millville, NJ 08332 | T.M. & C.M. | R.H. | Chase 1760759315 | Chase Court Orders & Levies Dept. 451 Florida Street Baton Rouge, LA 70801 |

| | Subject Property | Original Homeowner | Investor/ "Straw Buyer" | Original Lender & Account | Lender/Servicer Contact Information |
|---|---|---|---|---|---|
| 47 | 220 Donna Lane, Birdsboro, PA 19508 | L.M. & N.M. | G.M. | BB&T 6991822966 | BB&T Attention: John P. Harmon 301 College Street Greenville, SC 29601 |
| 48 | 221 Pelican Court, Foster City, CA 94404 | D.H. | L.T. | ASC 1158065836 (1st Mortgage)<br><br>GMAC 0-359419002 (2nd Mortgage) | GMAC Summons Department GMAC Res. Cap. Attention: Legal Staff 190-FTW-L95 1100 Virginia Drive Fort Washington, PA 19034 |
| 49 | 225 South Melville St., Philadelphia, PA 19139 | M.P. | J.O. | AmTrust Bank 1086447 | AmTrust Bank Legal Department Attention: Sue Aukerman 1801 E. 9th Street Cleveland, OH 44114 |
| 50 | 23 Marjorie Way, Hamilton, NJ 08690 | S.S. & D.S. | Y.K. | Chase 1860467650 | Chase Court Orders & Levies Dept. 451 Florida Street Baton Rouge, LA 70801 |
| 51 | 2305 Catherine St., Philadelphia, PA 19146 | S.C. | J.B. | Bank of America 6780803646 | Bank of America Attn: Legal & Subpoena Group 100 N. Tryon Street Charlotte, NC 28255-0001 |
| 52 | 24 Crestmont Rd., Verona, NJ 07044 | W.S. | L.T. | Countrywide 152525544 | Bank of America Attn: Legal & Subpoena Group 100 N. Tryon Street Charlotte, NC 28255-0001 |
| 53 | 250 Center Road, Elmer, NJ 08318 | C.M. & P.M. | D.H. | Chase 1760768236 | Chase Court Orders & Levies Dept. 451 Florida Street Baton Rouge, LA 70801 |
| 54 | 26 Georgetown Blvd., Barnegat, NJ 08005 | D.M. | Y.K. | Wells Fargo 0-206631772 | Wells Fargo Home Mortgage Attention: Legal Department 1 Home Campus MACX2401-06T Des Moines, IA 50328 |
| 55 | 2620 Finlaw Ave., Pennsauken, NJ 08109 | P.P. | C.R. | Taylor Bean & Whitaker 2278728 | Ocwen Servicing c/o Corporation Service Co. 2711 Centerville Road, Suite 400 Wilmington, DE 19808 |

| | Subject Property | Original Homeowner | Investor/ 'Straw Buyer" | Original Lender & Account | Lender/Servicer Contact Information |
|---|---|---|---|---|---|
| 56 | 268 Montclair Ave., Vauxhall, NJ 07088 | E.S. & T.S. | D.P. | GMAC (0)477620421 | GMAC Summons Department GMAC Res. Cap. Attention: Legal Staff 190-FTW-L95 1100 Virginia Drive Fort Washington, PA 19034 |
| 57 | 2715 Fries Mills Rd., Williamstown, NJ 08094 | R.C. & A.C. | B.R. | Countrywide 189266625 | Bank of America Attn: Legal & Subpoena Group 100 N. Tryon Street Charlotte, NC 28255-0001 |
| 58 | 281 Lyme Street, Hartford, CT 06114 | S.J. | B.T. | AHMSI - American Home Mortgage Servicing Inc. 4001401886 | American Home Mortgage Servicing, Inc. Fax: 866-795-6529 |
| 59 | 285 Fairview Ave., Hampton Twp., NJ 07860 | V.R. & S.L-R. | J.S. | Citimortgage 2005217484-2 | CitiMortgage Attention: John James 1000 Technology Drive MS140 O'Fallon, MO 63368 |
| 60 | 2953 Garden Lane, Bensalem, PA 19020 | A.B. | S.R | Waterfield Bank 00000-28661 | Waterfield Bank Operations and Services 18881 Von Karman, Suite 1700 Irvine, CA 92612 |
| 61 | 30 Francis Ave., Hamilton Twp., NJ 08629 | R.S.-C. & V. S.-C. | D.H. | Chase 1760737185 | Chase Court Orders & Levies Dept. 451 Florida Street Baton Rouge, LA 70801 |
| 62 | 303 Ardmore Ave., Trenton, NJ 08629 | J.B. & J.B. | N.A. | Freedom Mortgage 00-82916750 | Freedom Mortgage LoanCare Servicing Center, Inc. Attention: Legal Department 3637 Suntara Way, Suite 303 Virginia Beach, VA 23452 |
| 63 | 303 E. Magnolia Ave., Galloway, NJ 08205 | Estate of A.A. | D.P. | Taylor Bean & Whitaker 2969091 | Ocwen Servicing c/o Corporation Service Co. 2711 Centerville Road, Suite 400 Wilmington, DE 19808 |
| 64 | 306 Cayuga Trail, Browns Mills, NJ 08015 | D.M. | J.O. | Freedom Mortgage 00-82669110 | Freedom Mortgage LoanCare Servicing Center, Inc. Attention: Legal Department 3637 Suntara Way, Suite 303 Virginia Beach, VA 23452 |

|  | Subject Property | Original Homeowner | Investor/ "Straw Buyer" | Original Lender & Account | Lender/Servicer Contact Information |
|---|---|---|---|---|---|
| 65 | 31 Deidre Drive, Egg Harbor Twp., NJ 08234 | R.H. & M.E.-H. | M.B. | Bank of America 6310076382 | Bank of America Attn: Legal & Subpoena Group 100 N. Tryon Street Charlotte, NC  28255-0001 |
| 66 | 31 Indian Hill Rd., Freehold, NJ 07728 | S.R.H. | W.D. | Central Mortgage Company 5779275962 | Ocwen Servicing c/o Corporation Service Co. 2711 Centerville Road, Suite 400 Wilmington, DE 19808 |
| 67 | 3223 E. 2160th Ave. Montrose, IL 62445 | M.C. & T.C. | G.G. | GMAC      0-601696557 | GMAC Summons Department GMAC Res. Cap. Attention: Legal Staff 190-FTW-L95 1100 Virginia Drive Fort Washington, PA  19034 |
| 68 | 33 Jensen Ave., Fords, NJ 08863 | M.J. | N.A. | AmTrust Bank 1818312 | AmTrust Bank Legal Department Attention: Sue Aukerman 1801 E. 9th Street Cleveland, OH  44114 |
| 69 | 34 Clinton Ave., Clifton, NJ 07011 | S.W. & E.P. & H.P. | E.C. | Countrywide 154397463 (1st Mortgage) & 154397479 (2nd Mortgage) | Bank of America Attn: Legal & Subpoena Group 100 N. Tryon Street Charlotte, NC  28255-0001 |
| 70 | 3444 Primrose Rd. Philadelphia, PA  19114 | G.C. | J.M. | Oak Mtg. LLC 52128652 | First Niagara Bank Legal Documents Fax: 716-838-8920 |
| 71 | 346 State St., Cherry Hill, NJ 08034 | E.D. & A.D. | M.H. | Indymac 3002748949 | OneWest Bank c/o Corporation Service Co. 2711 Centerville Road Wilmington, DE 19808 |
| 72 | 3520 Sunnyside Ave., Philadelphia, PA 19129 | D.H. | L.P. | Wells Fargo 259290435 | Wells Fargo Home Mortgage Attention: Legal Department 1 Home Campus MACX2401-06T Des Moines, IA  50328 |
| 73 | 36 Nevada Dr., Hazlet, NJ 07730 | L.W. & J.S. & O.S. | M.L. | Countrywide 176852392 | Bank of America Attn: Legal & Subpoena Group 100 N. Tryon Street Charlotte, NC  28255-0001 |
| 74 | 3670 Academy Rd., Philadelphia, PA 19154 | J.O. | M.P. | Taylor Bean & Whitaker 2879447 | Ocwen Servicing c/o Corporation Service Co. 2711 Centerville Road, Suite 400 Wilmington, DE 19808 |

| | Subject Property | Original Homeowner | Investor/ "Straw Buyer" | Original Lender & Account | Lender/Servicer Contact Information |
|---|---|---|---|---|---|
| 75 | 37 Kossuth St., Newark, NJ 07105 | O.M.D. | W.D. | AmTrust Bank 1745186 | AmTrust Bank Legal Department Attention: Sue Aukerman 1801 E. 9th Street Cleveland, OH 44114 |
| 76 | 370 Fox Hunt Dr., Nottingham, PA 19362 | C.A. & G.A. | L.T. | Countrywide 129988134 | Bank of America Attn: Legal & Subpoena Group 100 N. Tryon Street Charlotte, NC 28255-0001 |
| 77 | 3817 N. Park Ave., Philadelphia, PA 19140 | N.M. | Z.J. | AmTrust 1755340 | AmTrust Bank Legal Department Attention: Sue Aukerman 1801 E. 9th Street Cleveland, OH 44114 |
| 78 | 387 Centerton Rd., Bridgeton, NJ 08302 | J.S. | M.H. | GMAC 0-713270814 (1st Mortgage) and ASC 1158067415 (2nd Mortgage) | GMAC Summons Department GMAC Res. Cap. Attention: Legal Staff 190-FTW-L95 1100 Virginia Drive Fort Washington, PA 19034 |
| 79 | 4 Blanche Drive, New Egypt, NJ 08533 | M.O. & T.O. | R.A. | Chase 1760706283 | Chase Court Orders & Levies Dept. 451 Florida Street Baton Rouge, LA 70801 |
| 80 | 4 Constellation Place Unit #106, Jersey City, NJ 07305 | M.M. & C.M. | M.H. | Countrywide 158295285 (1st Mortgage) & 158295293 (2nd Mortgage) | Bank of America Attn: Legal & Subpoena Group 100 N. Tryon Street Charlotte, NC 28255-0001 |
| 81 | 40 Jewett Ave., Jersey City, NJ 07304 | B.P. | J. B. | Countrywide 177082291 | Bank of America Attn: Legal & Subpoena Group 100 N. Tryon Street Charlotte, NC 28255-0001 |
| 82 | 406 Princess Ave., Croyden, PA 19021 | L.B. | J.O. | Amtrust Bank 1086456 | AmTrust Bank Legal Department Attention: Sue Aukerman 1801 E. 9th Street Cleveland, OH 44114 |
| 83 | 435 E. Malaga Rd., Williamstown, NJ 08094 | S.H. & R.H. | M.H. | Chase 1760715808 | Chase Court Orders & Levies Dept. 451 Florida Street Baton Rouge, LA 70801 |

|    | Subject Property | Original Homeowner | Investor/ "Straw Buyer" | Original Lender & Account | Lender/Servicer Contact Information |
|----|------------------|--------------------|-------------------------|---------------------------|-------------------------------------|
| 84 | 45 Robert St. Buxton, ME 04093 | W.R. & J.R. | T. S. | Ocwen Loan Servicing 40541799 | Ocwen Servicing c/o Corporation Service Co. 2711 Centerville Road, Suite 400 Wilmington, DE 19808 |
| 85 | 4546 N. Front St., Philadelphia, PA 19140 | A.O. | K.H. | Citi Mortgage 1120512736-5 | CitiMortgage Attention: John James 1000 Technology Drive MS140 O'Fallon, MO 63368 |
| 86 | 4601 Saint David's St., Philadelphia, PA 19127 | M.A.P. | J.A. & S.A. | Taylor Bean & Whitaker 2867897 | Ocwen Servicing c/o Corporation Service Co. 2711 Centerville Road, Suite 400 Wilmington, DE 19808 |
| 87 | 4905 Bala Court, Unit 177, Mays Landing, NJ 08021 | K.M. | F.T. | Countrywide 188042896 | Bank of America Attn: Legal & Subpoena Group 100 N. Tryon Street Charlotte, NC 28255-0001 |
| 88 | 513 West Marshall St., West Chester, PA 19380 | J.B. & E.B. | L.B. | CHASE 1749417781 | Chase Court Orders & Levies Dept. 451 Florida Street Baton Rouge, LA 70801 |
| 89 | 530 N Harrisburg Ave., Atlantic City, NJ 08401 | G.N. | K.H. | AmTrust Bank 2194925 | AmTrust Bank Legal Department Attention: Sue Aukerman 1801 E. 9th Street Cleveland, OH 44114 |
| 90 | 5311 22 NE Terrace, Ocala, FL 34483 | J.F. | B.T. | Home Eq. Servicing 325346690 (1st Mortgage) & 325320455 (2nd Mortgage) | HomeEq Servicing c/o CT Corporation 818 West 7th Street Los Angeles, CA 90017 |
| 91 | 535 East Ave., Glenside, PA 19038 | N.N. | G.M. | AmTrust Bank 7724953 | AmTrust Bank Legal Department Attention: Sue Aukerman 1801 E. 9th Street Cleveland, OH 44114 |
| 92 | 56 Bennett St., Phillipsburg, NJ 08690 | L.P. & C.S. | D.W. | Bank of America 6019065710 | Bank of America Attn: Legal & Subpoena Group 100 N. Tryon Street Charlotte, NC 28255-0001 |

| | Subject Property | Original Homeowner | Investor/ "Straw Buyer" | Original Lender & Account | Lender/Servicer Contact Information |
|---|---|---|---|---|---|
| 93 | 58 Terrace Ave. Pine Hill, NJ 08021 | F.B. | C.A. | NovaStar Mortgage | Ocwen Servicing c/o Corporation Service Co. 2711 Centerville Road, Suite 400 Wilmington, DE 19808 |
| 94 | 5890 Route 412, Reigelsville, PA 18077 | D.B. & S.B. | M.H. | Countrywide 166182624 | Bank of America Attn: Legal & Subpoena Group 100 N. Tryon Street Charlotte, NC 28255-0001 |
| 95 | 59 Lehigh Ave., Avenel, NJ 07001 | L.M. | D.H. | Indymac 3002773509 | OneWest Bank c/o Corporation Service Co. 2711 Centerville Road Wilmington, DE 19808 |
| 96 | 5922 Christian Street, Philadelphia, PA 19143 | M.L.T. | E.A. & M.A. | BB&T 6991822915 | BB&T Attention: John P. Harmon 301 College Street Greenville, SC 29601 |
| 97 | 6016 Santa Monica Dr., Tampa, FL 33615 | M.V. & J.V. | M.H. | Countrywide 171112475 | Bank of America Attn: Legal & Subpoena Group 100 N. Tryon Street Charlotte, NC 28255-0001 |
| 98 | 610 W. Glenwood Ave., West Wildwood, NJ 08260 | R.R. & D.R. | L.B. | Wachovia 0007911724-00 | Wells Fargo Home Mortgage Attention: Legal Department 1 Home Campus MACX2401-06T Des Moines, IA 50328 |
| 99 | 65 Woodbine Ave., Havertown, PA 19083 | J.J. & A.J. | D.V. | Superior Home Mortgage 610-06445 | Superior Home Mortgage Attention: Legal Department 854 S. White Horse Pike Augusta Professional Center Hammonton, NJ 08037 |
| 100 | 664 Windsor Ave., Maple Shade, NJ 08052 | K.C. & S.C. | V.T. & F.T. | Countrywide 190419481 | Bank of America Attn: Legal & Subpoena Group 100 N. Tryon Street Charlotte, NC 28255-0001 |
| 101 | 7 Davis Drive, Bridgeton, NJ 08302 | J.R. | L.P. | Flagstar Bank 502002611 | Flagstar Bank Attention: Legal Department 5151 Corporate Drive Troy, MI 48098 |
| 102 | 7641 E 106th Ave., Crown Point, IN 46307 | R.W. & N.W. | G.G. | Chase 1161367284 | Chase Court Orders & Levies Dept. 451 Florida Street Baton Rouge, LA 70801 |

| | Subject Property | Original Homeowner | Investor/ "Straw Buyer" | Original Lender & Account | Lender/Servicer Contact Information |
|---|---|---|---|---|---|
| 103 | 8 Stevens Road, Kendall Park, NJ 08824 | C. S.-N. | L.P. | Chase 1749478334 | Chase Court Orders & Levies Dept. 451 Florida Street Baton Rouge, LA 70801 |
| 104 | 80 St. Marys St., Wharton, NJ 07885 | M.W. & D.W. | J.B. | Countrywide 168259109 | Bank of America Attn: Legal & Subpoena Group 100 N. Tryon Street Charlotte, NC 28255-0001 |
| 105 | 801 Glasgow St., Stowe, PA 19464 | P.H. | M.B. | Flagstar Bank 502300768 | Flagstar Bank Attention: Legal Department 5151 Corporate Drive Troy, MI 48098 |
| 106 | 805 Ivydale Ave., Reistertown, MD 21136 | L.A. | F.T. & V.T. | Countrywide 175381159 | Bank of America Attn: Legal & Subpoena Group 100 N. Tryon Street Charlotte, NC 28255-0001 |
| 107 | 812 Ridge Ave., Asbury Park, NJ 07712 | M.H.S. | F.P. & S.P. | Flagstar Bank 502252059 | Flagstar Bank Attention: Legal Department 5151 Corporate Drive Troy, MI 48098 |
| 108 | 83 Park Ave., Engelwood, NJ 07631 | W.H. & C.H. | M.P. | GMAC 0-477600258 | GMAC Summons Department GMAC Res. Cap. Attention: Legal Staff 190-FTW-L95 1100 Virginia Drive Fort Washington, PA 19034 |
| 109 | 84 Azalea Circle, Jackson, NJ 08527 | P.D. | S.T. | Chase 1760765351 | Chase Court Orders & Levies Dept. 451 Florida Street Baton Rouge, LA 70801 |
| 110 | 851 Phillips Road, Warminster, PA 18974 | W.G. & B.G. | J.A. | AmTrust Bank 1218404 | AmTrust Bank Legal Department Attention: Sue Aukerman 1801 E. 9th Street Cleveland, OH 44114 |
| 111 | 9 Arnet Place, Cranford, NJ 07016 | D.B. | J.B. | Citi Mortgage 2005081290-6 | CitiMortgage Attention: John James 1000 Technology Drive MS140 O'Fallon, MO 63368 |

|  | Subject Property | Original Homeowner | Investor/ "Straw Buyer" | Original Lender & Account | Lender/Servicer Contact Information |
|---|---|---|---|---|---|
| 112 | 9 Goldweber Ave., Jackson, NJ 08527 | C.C. | T.B. | Bank of America 6585317206 | Bank of America Attn: Legal & Subpoena Group 100 N. Tryon Street Charlotte, NC 28255-0001 |
| 113 | 962 Lenape Drive, Cape May, NJ 08204 | E.H. | S.T. | Countrywide 176999056 | Bank of America Attn: Legal & Subpoena Group 100 N. Tryon Street Charlotte, NC 28255-0001 |
| 114 | 9731 Chapel Rd., Philadelphia, PA 19115 | A.Z. | Y.K. | Citi Mortgage 2004971726 | CitiMortgage Attention: John James 1000 Technology Drive MS140 O'Fallon, MO 63368 |
| 115 | 99 Mount Lane, Toms River, NJ 08753 | D.M. & C.M. | Y.K. | Bank of America 6880069619 | Bank of America Attn: Legal & Subpoena Group 100 N. Tryon Street Charlotte, NC 28255-0001 |
| 116 | Doubletree Condo, Unit 56 56 Winterberry Ct. Glassboro, NJ 08028 | E.S. & L.S. | M.M.W. | Integrated Funding (Financial) Group - Langhorne, PA | Chase Court Orders & Levies Dept. 451 Florida Street Baton Rouge, LA 70801 |
| 117 | 271 Uxbridge Dr. Cherry Hill, NJ 08034 | D.B. & J.B., L.K. & M.K. | D.M.I. | Lehman Bros. Bank | Aurora Bank 1000 N. West St., Suite 200 Wilmington, DE 19801 |
| 118 | 4744 West St. Whitehall, PA 18052 | J.C. | J.M. | Oak Mortgage Company 010903727 | First Niagara Bank Legal Documents 726 Exchange St., Suite 618 Buffalo, NY 14210 |
| 119 | 364 E. Mechanic St. Philadelphia, PA 19144 | E.R. | C.H. | Parke Bank 2691 | Parke Bank P.O. Box 40 Sewell, NJ 08080 |
| 120 | 5050 Germantown Ave. Philadelphia, PA 19144 | E.R. | J.M. | Parke Bank 2859 | Parke Bank P.O. Box 40 Sewell, NJ 08080 |

# Exhibit C



**U.S. Department of Justice**

*United States Attorney*

*Eastern District of Pennsylvania*

---

*Michael S. Blume*
*Direct Dial: (215) 861-8376*
*Facsimile: (215) 861- 8618*
*E-mail Address: Michael.Blume@usdoj.gov*

*615 Chestnut Street*
*Suite 1250*
*Philadelphia, Pennsylvania 19106-4476*
*(215) 861-8200*

Name
Address
City, State Zip

RE:     DeMarco REI, Inc.
        OPM Group, LLC
        Anthony J. DeMarco, III

Dear [original homeowner]:

**THIS IS AN IMPORTANT LETTER FROM THE UNITED STATES GOVERNMENT REGARDING YOUR HOME.  IF YOU HAVE ANY QUESTIONS OR CONCERNS ABOUT THIS LETTER, CALL ASSISTANT UNITED STATES ATTORNEYS MICHAEL BLUME, 215-861-8376, OR STACEY SMITH, 215-861-8348.  PLEASE READ THE ENTIRE LETTER.**

It is our understanding that you have dealt with DeMarco REI, Inc., OPM Group, LLC, and/or Anthony J. DeMarco, III.  You may have done so in an attempt to save your house from foreclosure.  That house is identified on the following page.

A federal court has issued an Order that prevents anyone from taking any steps to transfer ownership of that house, including foreclosing on it.  A copy of the Order is enclosed.  The Order means that **you may be able to save your house**.

If you are interested in participating in a mediation session to help save your house, a session overseen by the United States District Court for the Eastern District of Pennsylvania, please fill out the attached form and mail it back to us in the enclosed envelope.

The Court will hold a hearing concerning the Order on _____, at _____, a/p.m., in Courtroom _____, the United States Courthouse, 601 Market Street, Philadelphia, Pennsylvania, at which you are invited to attend.

Sincerely,

ZANE DAVID MEMEGER
United States Attorney

_____
Michael S. Blume/Stacey L.B. Smith
Assistant United States Attorneys

# Exhibit D



**U.S. Department of Justice**

*United States Attorney*

*Eastern District of Pennsylvania*

---

*Michael S. Blume*
*Direct Dial: (215) 861-8376*
*Facsimile: (215) 861- 8618*
*E-mail Address: Michael.Blume@usdoj.gov*

*615 Chestnut Street*
*Suite 1250*
*Philadelphia, Pennsylvania 19106-4476*
*(215) 861-8200*

Name
Address
City, State Zip

    RE:   DeMarco REI, Inc.
           OPM Group, LLC
           Anthony J. DeMarco, III

Dear [investor]:

**THIS IS AN IMPORTANT LETTER FROM THE UNITED STATES GOVERNMENT. IF YOU HAVE ANY QUESTIONS OR CONCERNS ABOUT THIS LETTER, CALL ASSISTANT UNITED STATES ATTORNEYS MICHAEL BLUME, 215-861-8376, OR STACEY SMITH, 215-861-8348.  PLEASE READ THE ENTIRE LETTER.**

It is our understanding that you have dealt with DeMarco REI, Inc., OPM Group, LLC, and/or Anthony J. DeMarco, III.  You may have done so as an "investor" in a property (or properties) in a foreclosure rescue program.  Those properties are identified on the following page.

A federal court has issued an Order that prevents anyone from taking any steps to transfer ownership of those properties, including evicting anyone who may be living in the properties.  A copy of the Order is enclosed.  The Order means that **you must obtain approval from the Court before taking any steps regarding the properties.**

The Court will hold a hearing concerning the Order on _____, at _____, a/p.m., in Courtroom _____, the United States Courthouse, 601 Market Street, Philadelphia, Pennsylvania, at which you are invited to attend.

                            Sincerely,

                            ZANE DAVID MEMEGER
                            United States Attorney

                            _____
                            Michael S. Blume/Stacey L.B. Smith
                            Assistant United States Attorneys

# Exhibit E



**U.S. Department of Justice**

*United States Attorney*

*Eastern District of Pennsylvania*

---

*Michael S. Blume*
*Direct Dial: (215) 861-8376*
*Facsimile: (215) 861- 8618*
*E-mail Address: Michael.Blume@usdoj.gov*

*615 Chestnut Street*
*Suite 1250*
*Philadelphia, Pennsylvania 19106-4476*
*(215) 861-8200*

Name
Address
City, State Zip

  RE: <u>United States v. DeMarco REI, Inc.</u>, No.

Dear [financial institution]:

**THIS IS AN IMPORTANT LETTER FROM THE UNITED STATES GOVERNMENT. IF YOU HAVE ANY QUESTIONS OR CONCERNS ABOUT THIS LETTER, CALL ASSISTANT UNITED STATES ATTORNEYS MICHAEL BLUME, 215-861-8376, OR STACEY SMITH, 215-861-8348.  PLEASE READ THE ENTIRE LETTER.**

It is our understanding that you have an interest, as a lender or servicer, in the properties listed on the following page.  A federal court has issued an Order, in the above matter, that prevents anyone from taking any steps to transfer ownership of those properties, including foreclosing on those properties.  A copy of the Order is enclosed.  The Order means that **you must obtain approval from the Court before taking any steps regarding the properties.**

The Court will hold a hearing concerning the Order on _____, at _____, a/p.m., in Courtroom _____, the United States Courthouse, 601 Market Street, Philadelphia, Pennsylvania, at which you are invited to attend.

Sincerely,

ZANE DAVID MEMEGER
United States Attorney

_____
Michael S. Blume/Stacey L.B. Smith
Assistant United States Attorneys

# Exhibit F



**U.S. Department of Justice**

*United States Attorney*

*Eastern District of Pennsylvania*

---

*Michael S. Blume*
*Direct Dial: (215) 861-8376*
*Facsimile: (215) 861- 8618*
*E-mail Address: Michael.Blume@usdoj.gov*

*615 Chestnut Street*
*Suite 1250*
*Philadelphia, Pennsylvania 19106-4476*
*(215) 861-8200*

Name
Address
City, State Zip

      RE:    <u>United States v. DeMarco REI, Inc.</u>, No.

Dear [attorney]:

**THIS IS AN IMPORTANT LETTER FROM THE UNITED STATES GOVERNMENT. IF YOU HAVE ANY QUESTIONS OR CONCERNS ABOUT THIS LETTER, CALL ASSISTANT UNITED STATES ATTORNEYS MICHAEL BLUME, 215-861-8376, OR STACEY SMITH, 215-861-8348. PLEASE READ THE ENTIRE LETTER.**

It is our understanding that you represent a financial institution that may have an interest, as a lender or servicer, in the properties listed on the following page. A federal court has issued an Order, in the above matter, that prevents anyone from taking any steps to transfer ownership of those properties, including foreclosing on those properties. A copy of the Order is enclosed. The Order means that **your client must obtain approval from the Court before taking any steps regarding the properties.**

The Court will hold a hearing concerning the Order on _____, at \_\_\_\_, a/p.m., in Courtroom \_\_\_\_\_, the United States Courthouse, 601 Market Street, Philadelphia, Pennsylvania, at which you and/or your client are invited to attend.

                           Sincerely,

                           ZANE DAVID MEMEGER
                           United States Attorney

                           _____
                           Michael S. Blume/Stacey L.B. Smith
                           Assistant United States Attorneys